IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

TERRELL K. ELEBY,

Plaintiff,

Civil Action No.
9:15-CV-0281 (TJM/DEP)

v.

G. SMITH and N. VEVONE,

Defendants.

---

APPEARANCES: OF COUNSEL:

FOR PLAINTIFF:

TERRELL K. ELEBY, *Pro Se*
86-A-0908
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY 10562

FOR DEFENDANTS:

ERIC T. SCHNEIDERMAN
New York State Attorney General
The Capitol
Albany, NY 12224

CHRISTOPHER J. HUMMEL, ESQ.
Assistant Attorney General

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

This is a civil rights action brought by *pro se* plaintiff Terrell Eleby against three individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), one of whom has since been dismissed from the action, pursuant to 42 U.S.C. § 1983. In his complaint, plaintiff alleges that two of the defendants assaulted him in violation of his Eighth Amendment rights, and the third defendant violated his Fourteenth Amendment rights by issuing an allegedly false misbehavior report against him and confining him in the special housing unit ("SHU") at the prison facility in which he was housed.

Currently pending before the court is a motion brought by the remaining two defendants seeking the entry of summary judgment in their favor based upon plaintiff's alleged failure to exhaust available administrative remedies before filing suit. For the reasons set forth below, I recommend that the defendants' motion be granted.

## I. BACKGROUND[1]

Plaintiff is a prison inmate currently held in the custody of the DOCCS. *See, e.g.,* Dkt. No. 29-2 at 13. Although plaintiff is now confined elsewhere, at the times relevant to this action he was housed in the Auburn Correctional Facility ("Auburn") located in Auburn, New York. *Id.* at 18.

In his complaint, plaintiff alleges that on January 14, 2015, he was waiting in one of Auburn's hospital dormitory rooms to be escorted to an outside facility for a medical examination. Dkt. No. 1 at 4; Dkt. No. 29-2 at 54. At approximately 10:00AM, defendants Smith and Vevone, both of whom are corrections officers, arrived at plaintiff's room to escort him on the medical trip. Dkt. No. 1 at 4. While plaintiff was attempting to remove his clothes for a mandatory strip search, defendant Smith "violently and physically attacked [him]." *Id.*; *see also* Dkt. No. 29-2 at 58. According to plaintiff, both defendants Smith and Vevone "jumped on [his] back," and defendant Smith punched him repeatedly in the eye, head, neck, back, and ribs. Dkt. No. 29-2 at 58, 62-63. After approximately five minutes Sergeant Cudla, who is not a named defendant in the action, arrived at

---

[1] In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

plaintiff's dorm, physically intervened, and ordered defendants Smith and Vevone to cease the assault and leave the room. Dkt. No. 1 at 4-5; Dkt. No. 29-2 at 58-59, 64. As a result of the alleged assault, plaintiff suffered various injuries, including a bloody and swollen eye, swelling and redness to his neck, and sore ribs. Dkt. No. 1 at 5; Dkt. No. 29-2 at 62-63, 67.

Following the use-of-force incident, defendants Smith and Vevone issued plaintiff a misbehavior report accusing him of violating six prison rules. Dkt. No. 22 at 9; Dkt. No. 29-2 at 72. Following a superintendent's hearing to address the charges, plaintiff was found guilty on four of the six counts. Dkt. No. 22 at 13; Dkt. No. 29-2 at 72. As a result of that finding, plaintiff was sentenced to serve thirty days of disciplinary SHU confinement, with a corresponding loss of commissary, package, and telephone privileges. Dkt. No. 22 at 13; Dkt. No. 29-2 at 73-72.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on or about March 12, 2015, with the filing of a complaint and accompanied by an application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. On May 12, 2015, Senior District Judge Thomas J. McAvoy issued a decision and order granting plaintiff's IFP application and accepting his complaint for filing, with the exception of

one cause of action.[2] Dkt. No. 11. In his third cause of action, plaintiff asserted a Fourteenth Amendment claim against defendant Lieutenant Quinn based on the allegation that defendant Quinn "conspire[d] and aided . . . in writing a false [misbehavior] report after ascertaining the facts [sic] that [defendants Smith and Vevone] were in the wrong." Dkt. No. 1 at 6. Judge McAvoy dismissed that cause of action for failure to state a cognizable claim pursuant to 28 U.S.C. §§ 1915(e), 1915A. Dkt. No. 11 at 9-12.

Following the close of discovery, defendants Smith and Vevone filed the currently pending motion for summary judgment seeking dismissal of plaintiff's complaint, arguing that plaintiff failed to fully exhaust available administrative remedies before filing this action. Dkt. No. 29-5. Plaintiff has filed a response in opposition to defendants' motion, which is now fully briefed, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

---

[2] Plaintiff's first and second IFP applications were denied as incomplete. Dkt. Nos. 4, 7. Following those denials, plaintiff filed a third IFP motion, on or about April 2, 2015, which was then granted by Judge McAvoy. Dkt. Nos. 9, 11.

## III. DISCUSSION

### A. Legal Standard Governing Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477

U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. Plaintiff's Exhaustion of Administrative Remedies

In their motion, defendants contend that plaintiff's complaint is subject to dismissal because plaintiff has failed to exhaust available administrative remedies as required under the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), prior to commencing this action. *See generally* Dkt. No. 29-5 at 2.

1. Legal Principles Governing Exhaustion Under the PLRA

The PLRA, which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is "mandatory" and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *Wilson v. McKenna*, --- F. App'x ----, No. 15-3496, 2016 WL 5791558, at *1 (2d Cir. Oct. 4, 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by

"compl[ying] with the system's critical procedural rules."[3] *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

New York affords state prison inmates the opportunity to seek redress of complaints regarding prison conditions through a grievance procedure that is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC")[4] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

---

[3] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[4] The IGRC is comprised of "two voting inmates, two voting staff members, and a non- voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[5] *Id.* at § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of an appeal. *Id.* at § 701.5(d)(2)(i).

It is worth noting that, as in this case, where an inmate complains of harassment or other misconduct by corrections officers or prison employees, the IGP provides for an expedited review process. 7 N.Y.C.R.R. § 701.8. In particular, the IGP requires inmates "who wish[] to file a grievance complaint that alleges employee harassment [to] follow the procedures set forth in [7 N.Y.C.R.R §] 701.5(a)[.]" *Id.* at § 701.8(a). As was noted above, section 701.5(a)(1) provides that, *inter alia*, the inmate shall submit his grievance to the clerk within twenty-one days of the

---

[5]        Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of an appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

incident of which he complains. *Id.* at § 701.5(a)(1). On the same day the clerk receives a grievance complaining of employee harassment, he must forward it "to the superintendent by the close of business." *Id.* at § 701.8(b).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate must appeal "to the next step." *Id.* at § 701.6(g)(2); *Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) (Suddaby, J.) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance . . . can – and must – be appealed to the next level. . . to complete the grievance process."). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory

exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA.[6] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or

---

[6] According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

2. Analysis

The record now before the court firmly establishes that plaintiff did not exhaust the available administrative remedies in accordance with the PLRA before commencing this action. According to plaintiff, following the alleged assault, he submitted a (1) grievance,[7] (2) letter to the superintendent at Auburn, (3) memorandum to the IGP supervisor at Auburn, and (4) letter to the New York State Inspector General ("IG") complaining of the alleged assault by defendants Smith and Vevone.[8] Dkt. No. 29-2 at 25-26, 39-40, 46-47, 50, 94-99, 104. Plaintiff did not receive any written response to any of his correspondence. Dkt. No. 29-2 at 40-42, 48-49, 51-53. He claims, however, that an officer stationed at Auburn, Sergeant Cudla, conducted an in-person interview of him on January 22,

---

7 Aside from plaintiff's testimony at his deposition, there is no record evidence to support his allegation that he filed a grievance in accordance with the IGP. *See, e.g.,* Dkt. No. 29-3 at 4; Dkt. No. 29-4 at 2.

8 In or about 2014 the DOCCS Office of Special Investigations assumed the role previously played by the IG, including investigating complaints regarding prison conditions. *See* DOCCS Directive No. 0700, available at http://www.doccs.ny.gov/Directives/0700.pdf.

2015, in connection with the grievance allegedly filed, and the IG's office conducted an investigation that included an interview of plaintiff in or about April 2015. *Id.* at 40-42, 48-49, 51-53. He also contends that he spoke directly to Deputy Robisson, the Deputy of Superintendent for Security at Auburn, regarding the assault. *Id.* at 31-32, 47-48, 100.

Notwithstanding the fact that he did not receive a written response to any of his correspondence regarding the alleged assault, plaintiff admittedly neglected to appeal the lack of a response to the next level of the IGP. *Id.* at 48-51. Because the IGP has been interpreted by courts in this circuit as requiring inmates to appeal to the next level when they do not receive a timely response to their grievance, plaintiff should have appealed to the superintendent and/or the CORC when he failed to receive a written response to the grievance he allegedly filed. *See* 7 N.Y.C.R.R. § 701.6(g)(2) ("[M]atters not decided within the time limits may be appealed to the next step."); *Dabney v. Pegano*, 604 F. App'x 1, 4-5 (2d Cir. 2015) (citing section 701.6(g) and concluding that, based on that provision, the plaintiff had "an unimpeded path to the CORC, notwithstanding his claims that the Great Meadow grievance clerk failed to process his complaint and that the Clinton superintendent ignored his appeal"); *Hyliger v. Gebler*, 624 F. App'x 780, 782 (2d Cir. 2015) ("Under

the regulations. . ., if at any step of the grievance process[] an inmate did not receive a response within the specified timeframe, he was nonetheless permitted to appeal to the next step. Thus, when [the plaintiff] did not receive a written response from the IGRC, appeal to the superintendent was still an available administrative remedy." (quotation marks, alteration, citation, and footnote omitted)). The record in this case shows, without contradiction, that while plaintiff appealed other grievance denials to the CORC, he did not do so in connection with defendants' alleged assault. Dkt. No. 29-3 at 4. This default constitutes a failure to exhaust available administrative remedies for purposes of the PLRA.

Liberally construing plaintiff's response to defendants' pending motion, he contends that he fully exhausted administrative remedies before commencing this action because his grievance involved allegations of employee harassment, and, consequently, by sending his letter directly to the superintendent he satisfied the requirements of the IGP. Dkt. No. 31 at 5. The IGP, however, clearly mandates that even those grievances complaining of employee harassment must be filed with the IGP clerk, who then must forward the grievance to the superintendent on the day of receipt. 7 N.Y.C.R.R. § 701.8(a). Writing and sending a letter directly to a superintendent does not satisfy the IGP. *See Dabney*, 604 F. App'x at 3

("The IGP also has an expedited process for harassment grievances, which pertains to employee conduct meant to annoy, intimidate, or harm an inmate. These grievances go directly to a superintendent." (quotation marks, citations omitted)); *see also Lopez v. Bushey*, No. 11-CV-0418, 2014 WL 2807532, at *9 (N.D.N.Y. Apr. 7, 2014) (Dancks, M.J.) ("If the grievance involves a claim of misconduct by staff, harassment or discrimination, it receives a code of 49 . . . . [T]he grievance is handled expeditiously by passing through the IGRC and going directly to the superintendent of the facility.").

Plaintiff next argues that he appealed the disciplinary hearing determination related to the misbehavior report he was issued, following the alleged assault by defendants Smith and Vevone, on January 14, 2015. Dkt. No. 31 at 3. Appealing a disciplinary hearing determination, however, is no substitute for filing and pursuing to completion a grievance through the IGP.[9] *See, e.g., McCoy v. Goord*, 255 F. Supp. 2d 233, 256 (S.D.N.Y. 2003).

---

[9] In any event, plaintiff's appeal of the disciplinary hearing determination does not complain of excessive force used by defendants Smith and Vevone. Dkt. No. 22 at 22-23. Instead, plaintiff argued on appeal that the hearing determination was based on insufficient evidence. *Id.* Accordingly, even assuming the appeal from the disciplinary hearing could act as a substitute for filing and pursuing a grievance through the IGP, plaintiff's appeal did not place prison officials on notice of his complaints of excessive force because he did not raise them in his appeal. *Id*.

Plaintiff also "asserts . . . that the defendants hinder[ed] [his] complaint from reaching the CORC and from being properly filed with the IGRC." Dkt. No. 31 at 5. While I am mindful of my obligation to draw all inferences in favor of the non-moving party on summary judgment, *Terry*, 336 F.3d at 137, this conclusory allegation is not supported by any record evidence. Indeed, plaintiff sets forth this contention in an unsworn memorandum of law, which is decidedly not evidence. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 142 (2d Cir. 2003) ("In support of the assertion that the police had received complaints of drug activity in the area, the district court cited, not to admissible evidence, but to the defendants' memorandum of law, which is not evidence at all."). In any event, even assuming plaintiff's contention constitutes competent evidence, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996). At his deposition in this matter, plaintiff unequivocally testified that he did not file an appeal of his grievance to the CORC. Dkt. No. 29-2 at 49-51. He now attempts to create a dispute of fact by arguing that defendants thwarted his appeal from reaching the CORC. Dkt. No. 31 at 5. This he cannot do. *Hayes*, 84 F.3d at 619.

Finally, to the extent plaintiff contends that his letter to the IG and any subsequent investigation constitutes exhaustion under the PLRA, plaintiff is incorrect. *See, e.g., Goodson v. Silver*, No. 09-CV-0494, 2012 WL 4449937, at *9 (N.D.N.Y. Sept. 25, 2012) (Suddaby, C.J.) ("[A]n IG's investigation of a matter and conclusion that it is unsubstantiated does not satisfy the exhaustion requirement[.]" (citing cases)).

In summary, because plaintiff admittedly failed to pursue a grievance filed under the IGP to completion by filing an appeal to the CORC, and because he has failed to set forth any evidence that the IGP was rendered unavailable to him, I recommend that defendants' motion be granted.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's remaining cause of action alleges that defendants Smith and Vevone applied excessive force against him on January 14, 2015. Although plaintiff alleges that he filed various written documents – including a grievance in accordance with the IGP – complaining of defendants' use of force, he admits that he did not pursue the matter through the IGP by seeking review of his grievance by the CORC, as required under the available grievance program. Accordingly, it is respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 29) be GRANTED and that plaintiff's complaint in this matter be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[10] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

The clerk of the court is respectfully directed to serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated: January 9, 2016
Syracuse, New York

[10] If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2016 WL 5791558
Only the Westlaw citation is currently available.
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals,
Second Circuit.

Alvin Wilson, Plaintiff–Appellant,
v.
Brooke McKenna, Defendant–Appellee,
John Doe, LT; Corrigan–R–CC, Hartford Superior Court, State Marshal Lockup Department, John Aver, Jane Doe, Hartford HCC, Doctor, DOC Medical Staff, John Doe, Hartford Hospital, an emergency room doctor, John Wayen, Jane Does, 3, Corrigan–R–CC DOC Medical Health Care Staff, John Williams, John Erfe, Warden, John Hanney, John Doe, Corrigan–R–CC, DOC, Medical Health Care Staff, Sharron Laplante, John Doe, Warden, Hartford HCC, DOC, F. Gillig, Omprakash Pillai, Monica J. Farinella, Ford, Warden, State of Connecticut, Defendants.

15-3496
|
October 4, 2016

**Synopsis**
**Background:** State inmate brought § 1983 action against correction officer alleging deliberate indifference to his medical needs in violation of his Eighth Amendment rights. The United States District Court for the District of Connecticut, Bryant, J., 2015 WL 5455634, entered summary judgment in favor of correction officer. Inmate appealed.

**[Holding:]** The Court of Appeals held that inmate failed to exhaust his administrative remedies, as required under Prison Litigation Reform Act (PLRA) to bring § 1983 claim.

Affirmed.

West Headnotes (1)

**[1]** **Civil Rights**

State inmate failed to exhaust his administrative remedies, as required under Prison Litigation Reform Act (PLRA) to bring § 1983 claim, before bringing his § 1983 action alleging that correction officer was deliberately indifferent to his medical needs in violation of his Eighth Amendment rights when she allegedly denied him medical care when he was injured, where inmate did not comply with Connecticut Department of Correction's administrative directive governing inmate grievances before filing suit, including filing inmate request form that contained his claim against officer after deadline, and filing grievance appeal form before filing level one grievance. U.S. Const. Amend. 8; Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

Appeal from a judgment of the United States District Court for the District of Connecticut (Bryant, *J.*).

***1 UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF–APPELLANT: Alvin Wilson, pro se, Suffield, Connecticut.

FOR DEFENDANT–APPELLEE: Zenobia Graham–Days, Assistant Attorney General, for George Jepsen, Attorney General of the State of Connecticut, Hartford, Connecticut.

PRESENT: DENNY CHIN, SUSAN L. CARNEY, Circuit Judges, KATHERINE B. FORREST, District Judge. *

**SUMMARY ORDER**

Plaintiff-appellant Alvin Wilson, proceeding *pro se*, appeals from a judgment in favor of defendant-appellee Corrections Officer Brooke McKenna in his suit under 42 U.S.C. § 1983, alleging deliberate indifference to his medical needs. The district court granted summary judgment to McKenna, concluding, *inter alia*, that Wilson had failed to exhaust his administrative remedies. We assume the parties' familiarity with the facts, procedural history, and issues on appeal.

As an initial matter, Wilson does not address exhaustion in his appellate brief, and therefore has abandoned any challenge to the district court's determination that he failed to exhaust his administrative remedies. *See LoSacco v. City of Middletown*, 71 F.3d 88, 92–93 (2d Cir. 1995). In any event, we conclude that the district court properly determined as a matter of law that Wilson failed to exhaust his administrative remedies.

We review *de novo* a district court's grant of summary judgment. *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126 (2d Cir. 2013) (per curiam). Summary judgment must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under the Prison Litigation Reform Act of 1995 (the "PLRA"), "[n]o action shall be brought with respect to prison conditions under [§ 1983] ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA requires "proper exhaustion," meaning exhaustion in "compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Nevertheless, the administrative remedies must be "available." *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, 1858, 195 L.Ed.2d 117 (2016). An administrative procedure is unavailable when (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Williams v. Priatno*, 829 F.3d 118, 122–24 (2d Cir. 2016) (quoting *Ross*, 136 S.Ct. at 1859–60).

The Connecticut Department of Correction ("DOC") requires inmates to submit grievances in accordance with Administrative Directive 9.6 ("AD 9.6"). Defendant's Cross–Motion for Summary Judgment, Ex. A, *Wilson v. McKenna*, No. 12–cv–1581, (S.D.N.Y. May 5, 2015), ECF No. 29. According to that directive, the aggrieved inmate must seek informal resolution prior to filing a grievance. AD 9.6 § 6.A. If attempts to resolve the issue verbally fail, then the inmate must submit an Inmate Request Form clearly stating the problem and requesting a remedy. *Id.* If no response from DOC is received within fifteen business days of receipt of the Inmate Request Form or if the remedy offered through informal resolution is unsatisfactory, the inmate may file a Level 1 grievance within thirty days of the incident giving rise to the grievance. *Id.* § 6.A, 6.C. To do so, he must submit an Inmate Administrative Remedy Form that covers requests for relief for both "Grievance[s]" and "Health Service Review[s]." Def. Cross–Mot. Summ. J., Ex. A at 16.

***2** When submitting a Level 1 grievance, the inmate must attach the previously-filed Inmate Request Form to the Inmate Administrative Remedy Form or explain why it is not attached. AD 9.6 § 6.C When an inmate files a grievance that fails to comply with these procedural requirements, DOC may either (1) return the grievance without disposition, at which point inmates are permitted to correct the error and refile the grievance, *id.* § 6.E, or (2) reject the grievance outright without giving the inmate an opportunity to refile, *id.* § 6.F. DOC is to provide a written response to the Level 1 grievance within thirty business days of receipt of the grievance. *Id.* § 6.I. An inmate may

appeal a Level 1 disposition to Level 2 within five calendar days of his receipt of the decision. *Id.* § 6.K.

As the district court concluded, the record shows that Wilson failed to properly exhaust the administrative remedies available to him before filing suit in federal court. Wilson alleges he was injured and denied necessary medical care by McKenna on September 16, 2012. Wilson filed an Inmate Administrative Remedy Form on September 20, 2012. On this form, Wilson checked a box indicating that he was "filing a Grievance." Def. Cross–Mot. Summ. J., Ex. I at 1. He did not check the box for "requesting a Health Services Review," but did check boxes for Diagnosis/Treatment" and "All Other Health Care Issues" in the Health Services Review section of the form. *Id.* Further, Wilson requested only medical care in the narrative portion of the form—no mention was made of McKenna, or any other guard for that matter. The form was treated as a request for Health Services Review and denied on October 16, 2016, because, by then, Wilson had been examined by medical staff on multiple occasions.

Wilson also submitted an Inmate Request Form on October 9, 2012, in which he mentioned the alleged incident with McKenna, but complained only about his lack of medical treatment. It was not until October 17, 2012, thirty-one days after he allegedly sustained an injury, that Wilson filed an Inmate Request Form detailing his complaint against McKenna. Although he also filed an Inmate Grievance Appeal Form—Levels $^{2}/_{3}$ on October 17, 2012, Wilson never filed a Level 1 grievance against McKenna.[1] Hence, Wilson failed to comply with the Administrative Directive: He did not submit a timely Level 1 grievance and his "appeals" were premature. Therefore, he did not demonstrate "proper exhaustion" and the district court properly entered summary judgment in favor of McKenna. *See Ross*, 136 S.Ct. at 1857 ("[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.").

Because Wilson did not raise the issue below or on appeal, we do not consider whether the grievance process was "unavailable" to him, either because his September 20, 2012 Inmate Administrative Remedy Form was treated as a request for Health Services Review rather than a Grievance, or for any other reason. *See Ross*, 136 S.Ct. at 1859–60; *Guzman v. Local 32B–32J, Serv. Emps. Int'l Union*, 151 F.3d 86, 93 (2d Cir. 1998).

We have considered Wilson's remaining arguments and conclude they are without merit. Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

--- Fed.Appx. ----, 2016 WL 5791558

Footnotes

* The Honorable Katherine B. Forrest, of the United States District Court for the Southern District of New York, sitting by designation.

1 We note that the record below indicates that DOC never received the forms Wilson purportedly filed on October 9, 2012, and October 17, 2012, a fact that he does not dispute. Nevertheless, we assume for the purposes of this appeal that the forms were indeed submitted.

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2807532
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

George LOPEZ, Plaintiff,
v.
D. BUSHEY, D. Jolicoen [1] C. Grimshaw, V. Olsen, W. Hunt, D. Venne, John Does 1–2, Defendants.

No. 9:11–CV–0418 (LEK/TWD).
|
Signed April 7, 2014.

**Attorneys and Law Firms**

Hancock Estabrook, LLP, Christopher R. Smith, Esq., of Counsel, Syracuse, NY, for Plaintiff.

George Lopez, Gouverneur, NY, pro se.

Hon. Eric T. Schneiderman, Gregory J. Rodriguez, Esq., of Counsel, Albany, NY, for Defendants.

***REPORT–RECOMMENDATION and ORDER***

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

***1** In this prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, Plaintiff George Lopez ("Plaintiff") alleges in his Complaint that Defendants violated his Eighth Amendment rights by subjecting him to excessive force and then conspired to cover up the incident. (Dkt. No. 1.) Plaintiff pursued the action *pro se* through discovery. Defendants moved for summary judgment which was granted in part and denied in part. (Dkt.Nos.53, 55.) All conspiracy claims were dismissed, but summary judgment was denied as to the excessive force claims. (Dkt. No. 55.) The Court then referred the case to the undersigned for a hearing to determine if Plaintiff properly exhausted his administrative remedies. *Id.* Thereafter, *pro bono* counsel for Plaintiff was assigned. [2] (Dkt. No. 56.) An evidentiary hearing was held on October 22, 2013, on the limited issues of whether administrative remedies were available to Plaintiff and whether Plaintiff's failure to exhaust may be excused by Plaintiff showing exhaustion unavailability, estoppel, or that special circumstances existed to justify the Plaintiff's failure to exhaust.

Based upon the evidence presented at the hearing, the Court finds that administrative remedies were available to Plaintiff, and he failed to properly and timely pursue those remedies. Specifically, the Court finds Plaintiff was not prevented by the actions of prison officials, including the named Defendants, from filing grievances or from seeking all of his administrative remedies. Plaintiff's failure to pursue his administrative remedies encompasses his failure to file initial grievances and his failure to properly and timely appeal to the superintendent of the relevant prison and the Central Office Review Committee ("CORC"). The Court further finds that Plaintiff has not proved unavailability, estoppel or special circumstances necessary to provide a basis to excuse his failure to exhaust such remedies. Therefore, the Court recommends that Plaintiff's Complaint (Dkt. No. 1) be dismissed on this procedural basis, with prejudice, and without addressing its merits.

## I. FACTUAL BACKGROUND

Plaintiff George Lopez was in custody of the Department of Corrections and Community Supervision ("DOCCS"), [3] housed at Clinton Correctional Facility ("Clinton") from October 7, 2005, through January 9, 2006. (Dkt. No. 45–6 ¶ 4.) He alleges that on the afternoon of November 20, 2005, he was involved in an altercation with two other inmates. (Dkt. No. 1 at 5.) Officers broke up the fight and Defendants Hunt and Olsen escorted Plaintiff to a room in the facility's hospital. *Id.* There, Plaintiff alleges that Defendants Hunt, Olsen, Bushey, Jolicoen, Grimshaw, and Venne subjected him to excessive force using a night stick, their fists, and their feet. *Id.* Plaintiff alleges that Defendants stripped him naked after the initial beating. *Id.* at 6. Plaintiff alleges that Defendant Hunt then used six-inch institutional keys to penetrate Plaintiff's rectum while Defendants Venne and John Does 1–2 held Plaintiff down. *Id.*

***2** In his Verified Complaint, Plaintiff alleges that he attempted to exhaust his administrative remedies regarding this incident, but that "prison officials hampered and interfered with his filing of a complaint with the Inmate Grievance Program ("IGP")." (Dkt. No. 1 at 4.) Specifically, Plaintiff alleges that "Sergeant Manos, ... who happens to have keys to the Mail

Box, looks through the Mail daily and, if he sees any Grievances, he will remove them and tear them up. Sergeant Manos will come to the inmate[']s cell with the Grievance and tear it in the inmate[']s face. Hence that is why Plaintiff's mail never got to it[ ]s destination or his Grievances processed." *Id.* at 9. Plaintiff alleges that he "was able to file a complaint with the Inspector General's Office by having another inmate's family contact his family and passing a message which informed Plaintiff[']s] family to contact the Inspector General's Office about the assault." *Id.* at 4.

## II. HEARING TESTIMONY AND EVIDENCE

At the evidentiary hearing, the Court heard testimony from five witnesses for Defendants, including Karen Bellamy, Tara Brosseau, Darryl Menard, Tammy Irwin, and Mark Miller. Plaintiff George Lopez also testified on his own behalf.

### A. Exhibits Received into Evidence

The Court received into evidence the following exhibits introduced by Defendants:

| | |
|---|---|
| D–4. | Special Housing Unit ("SHU") Inmate Orientation Manual dated January 2005; |
| D–5 | SHU Sign In Log Book Entries; |
| D–6. | DOCCS' printout regarding Plaintiff's internal movement within DOCCS; |
| D–8. | February 1, 2006, letter from Thomas Eagan to Plaintiff; |
| D–9. | DOCCS' Directive 4040 dated 8/22/03 with Revision Notice date of 4/16/04; |
| D–11. | CORC's printout for list of grievances filed by Plaintiff; |
| D–12A. | Report of Interview from Inspector General's ("IG") Office dated 12/8/05, p. 1; |
| D–12B. | Report of Interview from IG's Office dated 12/8/05, p. 2; |
| D–13. | February 27, 2012, letter from AAG Gregory J. Rodriguez to Plaintiff; |
| D–14. | Plaintiff's opposition to Defendants' Motion for Summary Judgment; and |
| D–15. | April 3, 2012, letter from Plaintiff to AAG Gregory J. Rodriguez. |

The Court received into evidence the following exhibits introduced by Plaintiff:

| | |
|---|---|
| P–4. | November 28, 2005, handwritten Grievance; and |

D–7. January 2, 2006, letter from Plaintiff to CORC.

The testimony and evidence at the hearing focused upon the broad issue of exhaustion of administrative remedies. Specifically, Defendants argued that administrative remedies were available to Plaintiff, and that Plaintiff nevertheless failed to exhaust. Plaintiff countered that assertion by arguing exhaustion unavailability, special circumstances, and estoppel. The Court recounts the relevant evidence in the context of those specific showings.

### B. Defendants' Initial Witnesses

1. *Karen Bellamy*

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Karen Bellamy ("Bellamy") is the Director of the Inmate Grievance Program ("IGP") for DOCCS. (Dkt. No. 69("T") at 4.) She maintains records of grievances and appeals in the Central Office of DOCCS. *Id.* at 4–5. She identified DOCCS' Directive 4040 (Exhibit D–9) as the document outlining the IGP for all DOCCS' facilities that was in place during the relevant time period. *Id.* at 7. The relevant IGP is a three-step program whereby the inmate files the initial grievance with the Inmate Grievance Review Committee ("IGRC") within fourteen days of an alleged occurrence. *Id.* at 7–9; *see also* Ex. D–9. If the inmate is unsatisfied with the decision of the IGRC, the next step is for the inmate to request review by the superintendent of the facility. *Id.* at 7–9; *see also* Ex. D–9. If an inmate is still unsatisfied, the inmate must then appeal to CORC. *Id.; see also* Ex. D–9. If an inmate files a grievance related to staff misconduct, the IGP supervisor sends that grievance directly to the superintendent for investigation and response. *Id.* at 15. An inmate may not file a grievance with CORC without first filing with the IGRC and appealing to the superintendent. *Id.* at 9, 12–13. Once an inmate has followed all of the applicable steps, his administrative remedies will be exhausted. *Id.* at 7.

***3** Bellamy reviewed the CORC database regarding Plaintiff and did not locate any appeal submitted to CORC by Plaintiff concerning a November 20, 2005, incident. *Id.* at 10; *see also* Ex. D–11. The CORC database search results did not show any active or closed appeals filed with CORC by Plaintiff. *Id.; see* Ex. D–11. However, a February 1, 2006, letter to Plaintiff from Thomas Eagan ("Eagan"), the previous Director of the IGP, was located. *Id.* at 11–12; Ex. D–8. Eagan indicated in that letter that the relevant facility administration did not have a record of a grievance from Plaintiff containing allegations of assault and abuse. *Id.; see also* Ex. D–8. Plaintiff was told that he could not refer a grievance directly to CORC and that he must submit his grievance to the grievance clerk at the relevant facility. *See* Ex. D–8.

2. *Tara Brousseau*

Tara Brosseau ("Brousseau") is employed by DOCCS as the IGP supervisor at Clinton. (T. at 24.) She oversees the IGP at the facility and processes all complaints and grievances in the office. *Id.* She reviews all grievances at Clinton, assigns them a title, code, and grievance number. *Id.* at 34. She confirmed that DOCCS' Directive 4040 (Ex. D–9) is the document that outlines the IGP for all DOCCS' facilities. *Id.* at 26. She described the three-step program as outlined above and in Directive 4040. *Id.* If a grievance involves a claim of staff misconduct, harassment or discrimination, it receives the code of 49. A copy with the grievance number assigned on it goes to the inmate, and the grievance is handled expeditiously by passing through the IGRC and going directly to the superintendent of the facility. *Id.* at 27, 34–35. If the grievance is not a code 49, and the matter cannot be resolved informally, a hearing is conducted within seven days. At the hearing, the inmate would is given a copy of the grievance with the grievance number on it. *Id.* at 36.

Inmates in the general population at Clinton become familiar with the grievance process through an orientation where the process is explained to them, including an explanation of Directive 4040. *Id* . at 45–46. They are not given any grievance directions in writing. *Id.* If an inmate is housed in the SHU, they can either access the law library or get direction from the grievance sergeant who does rounds every week. *Id.* An inmate files an initial grievance by submitting it through the facility mail. *Id.* at 27. In the SHU, a lock box is brought around for all mail including grievances from inmates. *Id.* The mail is forwarded from the SHU to the correspondence office where it is sorted. Grievances are forwarded to Brousseau's office. *Id.* There are specific grievance forms, but an inmate can submit a grievance on any type of paper. *Id.* Sergeant Menard, the SHU sergeant at the time of the relevant incident, had a key to the mail/grievance lock box. *Id.* at 39.

***4** Mechanisms are in place for inmates having difficulty getting a grievance filed. *Id.* at 28–29. An inmate can contact anyone from Brousseau's office, including her, or the inmate can talk to any executive staff member or officer about difficulties in filing a grievance. *Id.* at 29. The receiving staff member brings the grievance to Brousseau's attention and she makes sure someone from her office speaks to the inmate. *Id.* The grievance sergeant also makes rounds in the SHU and inmates housed there can report any grievances or problems with the program to that officer. *Id.* at 48. The SHU sign in log book reveals that a grievance office sergeant, Sergeant Giambruno, visited the SHU within fourteen days after the incident of November 20, 2005. *Id.* at 47–48; *see also* Ex. D–5. Additionally, if an investigator from the IG's office is involved in an investigation, an inmate can report any grievance or problems with the grievance program to that investigator. *Id.* at 32.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Brousseau reviewed the grievance database at Clinton for the time period of October 2005 to January of 2006 to determine what, if any, grievances had been filed by Plaintiff at that facility. *Id.* at 30–31. She did not locate any grievances from Plaintiff, nor did she find any grievance regarding an incident of November 20, 2005. *Id.* Per Directive 4040 relevant at the time, inmates had fourteen days after an event to file a grievance, but extensions of up to thirty days after an event were regularly given based upon mitigating circumstances. *Id.* at 31–32.

### C. Plaintiff's Testimony

Plaintiff was involved in an incident that occurred on November 20, 2005, after which he spent one day in the hospital followed by some time in the medical unit at Clinton. *Id.* at 54. He was then sent to the SHU. *Id.* He was not given any materials with which to write when in the SHU, and did not ask for them because officers threatened him, so he obtained materials from the inmate in the cell next to him. *Id.* at 55–57. At the hearing, he testified he wrote three grievances, but at his deposition he testified he wrote two grievances.[4] *Id.* at 59, 80–82. When he tried to submit the grievances in the morning mail collection, they never were put in the mailbox because the Sergeant collecting the mail ripped up his grievances in front of him. *Id.* In earlier submissions to the Court, Plaintiff indicated he put the grievances in the mailbox but that they did not reach their destination. *Id.* at 83. He believed this staff member who collected the mail and ripped up his grievances was Sergeant Mano or Manos. At the hearing, however, Plaintiff identified him as Sergeant Menard. *Id.* at 57–59, 79, 81–83, 86–87, 152. He did not know the names of any staff member who threatened him except Sergeant Menard. *Id.* at 78. He also tried two or three times to submit grievances through his cell neighbor while in the SHU. *Id.* at 102, 106.

***5** Plaintiff was aware of the grievance process and of Directive 4040 which outlines the process. *Id.* at 69, 93. He has submitted grievances "plenty of times." *Id.* He testified that no one from the IGRC ever came to his cell while he was in the SHU at Clinton, however, nor did anyone from IGRC announce themselves when on the unit. *Id.* at 60. He did not see other staff members or administrative staff members on the unit because he was on the floor of his cell and too weak to get up. *Id.* at 94–96. He wanted to get the grievance to somebody, but he did not want to talk to anyone about it. *Id.* at 97. He did speak to an investigator with the IG's office sometime, but did not recall when that conversation took place. *Id.* He did not recall if he complained to the investigator that someone was ripping up his grievances. *Id.* at 97, 107–109.

Plaintiff tried to file a grievance but was unable to because his mail was being ripped up and he was being threatened. *Id.* at 68. At the hearing, over an objection of Defendants' counsel that was based upon Plaintiff never having been produced the document during the years the years the case had been pending, Plaintiff submitted a document dated November 28, 2005, which he claimed was the grievance he tried to submit at Clinton about the November 20, 2005, incident. *Id.* at 69–71, 91–92; *see also* Ex. P–4. He tried to submit that grievance, which did not contain any code or grievance number on it, to the superintendent on January 2, 2006. *Id.* at 64–65, 90–92, 107; *see also* Ex. P–4 and D–14 at ¶ 18. Plaintiff also sent a letter to CORC on January 2, 2006, which he claims included a copy of his November 28, 2005, grievance. *Id.* at 64; *see also* Ex. D–7. The letter to CORC did not indicate that his grievances were being ripped up, but that it was possible his "mail may not have reached it's destination." *Id.* at 88; *see also* Ex. D–7. The only response he received was from CORC which indicated that Clinton had no record of his grievance. *Id.* at 66; *see also* Ex. D–8. He never received a response from the superintendent and no one from the IGRC ever spoke to him about the grievance. *Id.* He believed his letters to the IGRC and the superintendent were either ripped up, not mailed correctly or did not make it to the intended recipient. *Id.* at 103. He claimed he gave the inmate in the next cell grievances to submit to Clinton for him, and that the other inmate mailed his letter to CORC for him. *Id.* at 67, 102–103.

### D. Defendants' Rebuttal Witnesses

#### 1. *Tammy Irwin*

Tammy Irwin ("Irwin") is a clerk in the legal office at Clinton whose duties include collecting documentation for lawsuits. *Id.* at 112. A superintendent/security file containing letters by inmates filed with the superintendent, and any kind of code 49 investigation documents, is maintained on inmates at Clinton. *Id.* at 113–114. Irwin searched for a file regarding Plaintiff and found only a copy of February 1, 2006, letter to Plaintiff from Thomas Eagen. The letter indicates by date stamp that it was received in the superintendent's office on February 6, 2006. *Id.* at 114–115; *see also* Ex. D–8. Irwin did not find

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

any letter from Plaintiff to the superintendent or any other correspondence in the superintendent/security file. *Id.* at 113.

2. *Darryl Menard*

***6** Lieutenant Darryl Menard ("Menard") has worked for DOCCS for over 30 years. *Id.* at 116. In 2005 and 2006, he was the SITU sergeant on the day shift at Clinton working four days on and two days off. *Id.* at 116–117. Plaintiff arrived in the SITU on November 20, 2005. *Id.* at 120; *see also* Ex. D–6. At that time, when new inmates arrived in the SITU, they were given a verbal orientation which includes instructions about the grievance process. *Id.* at 118–119. Inmates were notified that grievances were picked up with the mail and placed in the same mailbox. *Id.* Although the mail was picked up in the morning on his shift, Menard did not push the mail cart through the unit. *Id.* at 120–122, 139. However, he was responsible for opening the mailbox and placing the mail into a bag that was then delivered to the correspondence office of the facility. *Id.* at 120–122, 127–129. This was done in the common hallway area of the SITU where there are cameras. *Id.*

At orientation, inmates were told that they could turn in a grievance to anyone on the staff making rounds, and that grievances did not have to be written on special forms. *Id.* at 123; *see also* Ex. D–4 at p. 20. Inmates were also given a SHU manual during orientation which included information about the IGP. *Id.* at 119–120; *see also* Ex. D–4. Inmates initially received a mini pen and writing paper, and a "legal cart" was brought around in SHU by the law library officer on a daily basis giving inmates an opportunity to obtain other items, including writing materials, forms, and law library requests. *Id.* at 121–122. The law library officer also collected the mail in the mailbox on that cart. *Id.* at 127.

Unit counselors made rounds in the SHU every day, and other staff including nurses, chaplains, the grievance supervisor, and executive staff routinely made rounds in the SHU. *Id.* at 131–135. The SHU sign in log book showed that various staff members made visits to the SHU on a regular basis from November 20, 2005, to January 10, 2006. *Id.; see also* Ex. D–5. Inmates could give grievances to any of the staff making rounds including executive staff. *Id.* at 135–136. The SHU log book shows that grievance Sergeant Giambruno made rounds in the SHU from 7:30a.m. to 8:28a.m. on December 2, 2005. He was among many people who made rounds between November 2005 and January 2006. *Id.* at 135; *see also* Ex. D–5. Of note, the SHU log book shows Sergeant Giambruno was also on the unit as an escort on December 1, 2005. Ex. D5.

3. *Mark Miller*

Mark Miller ("Miller") works for DOCCS as the Deputy Inspector General. *Id.* at 143. In 2005, he worked as the Assistant Deputy Inspector General supervising investigators in the region where Clinton is located. *Id.* at 144. He reviewed the IG's file regarding Plaintiff which revealed an internal affairs investigation concerning the November 20, 2005, incident. *Id.* IG investigator Kevin Reichelt ("Reichelt") interviewed Plaintiff on December 8, 2005, and prepared a report of the interview. *Id.* at 144–145; *see also* Ex. D–12A and D–12B. The SHU log book confirms Reichelt was on the unit from 1:55p.m. to 2:20p.m. on that day. Ex. D–5. Reichelt's report does not indicate that Plaintiff complained of grievances being ripped up or destroyed by staff at Clinton. *Id.* at 146; *see also* Ex. D–12A and D–12B. The report indicates that Plaintiff was being threatened and "was embarrassed to say anything before seeing [the investigator]." Ex. D–12B. If Plaintiff had complained of grievances being destroyed, the allegation would have been added to the investigation, and video of the location where the destruction occurred would have been reviewed for the relevant time and date to see if the destruction of grievances was occurring. *Id.* at 148. The investigator also looked for any grievances filed at the facility. *Id.* at 146–147.

## III. APPLICABLE LEGAL STANDARDS

### A. The Prison Litigation Reform Act of 1996

***7** As succinctly outlined by my colleague, Magistrate Judge David E. Peebles:

> The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law,

> by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action.... Proper exhaustion requires a plaintiff to procedurally exhaust his or her claims by complying with the system's critical procedural rules. Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken.

*Bailey v. Fortier,* 09–CV–0742 (GLS/DEP), 2012 WL 6935254, at *4, 2012 U.S. Dist. LEXIS 185178, at *11–13 (N.D.N.Y. Oct. 4, 2012) (citations and punctuation omitted). [5]

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution in which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citing *Woodford v. Ngo,* 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In New York State prisons, DOCCS has a well-established three-step inmate grievance program. N.Y. Comp.Codes R. & Regs. tit. 7, § 701 .5 (2013).

Generally, DOCCS' IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days [6] of the alleged occurrence. *Id.* at § 701.5(a). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at 701.5(b)(1). If there is no informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*id.* at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id.* at 701.5(c)(3)(i).

***8** Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* at 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at 701.5(d)(3) (ii).

An inmate may seek an extension of the time limits in writing at any of the steps, but such a request must be made within forty-five days of the incident being grieved or the decision being appealed. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.6(g) (2013). If an inmate believes that an extension was wrongly denied, he may file a separate grievance protesting the denial. *Id.*

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford,* 548 U.S. at 93.

### B. Burden of Proof at the Exhaustion Hearing-*Hemphill v. State of New York*

Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4, 2010 U.S. Dist. LEXIS 32014, at *16 (N.D.N.Y. Mar.31, 2010); *Bailey,* 2012 WL 6935254, at *6 (the party asserting failure to exhaust bears the burden of

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

proving its elements by a preponderance of the evidence); *see also Andrews v. Whitman,* No. 06–2447–LAB (NLS), 2009 WL 857604, at *6, 2009 U.S. Dist. LEXIS 30017, at *16 (S.D.Cal. Mar.27, 2009) (defendant must prove non-exhaustion of administrative remedies by a preponderance of the evidence).

If a defendant meets that burden, however, a plaintiff's failure to exhaust does not end the review. "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004) ]." *Murray,* 2010 WL 1235591, at *4. *Hemphill* sets forth a threepart inquiry for district courts. First, courts must determine if administrative remedies were in fact available to plaintiff. In *Hemphill,* the Second Circuit acknowledged the existence of the DOCCS' grievance procedure [N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7] and stated that "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill,* 380 F.3d at 688. Courts have found administrative grievance procedures unavailable where an inmate was prevented from filing a grievance. *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals ... effectively rendered the grievance appeal process unavailable to him.").

***9** Second, courts must determine if the defendants are estopped from presenting nonexhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by " 'beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility.' " *Hemphill,* 380 F.3d at 688 (citing *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004)). Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals. *Murray,* 2010 WL 1235591, at *5 & n. 26 (collecting cases); *McCloud v. Tureglio,* No. 07–CV–0650, 2008 WL 1772305, at *12, 2008 U.S. Dist. LEXIS 124388, at *44 (N.D.N.Y. Apr. 15, 2008) (Lowe, M.J.) ("None of those documents allege facts plausibly suggesting that Defendant's own actions inhibited Plaintiff's exhaustion of remedies during the time in question.").

Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even though administrative remedies may have been available and the defendants may not be estopped from asserting a non-exhaustion defense, the inmate's failure to exhaust may be justified. [7] *Hemphill,* 380 F.3d at 686. "Special circumstances" have been found to include an incorrect but reasonable interpretation of DOCCS' regulations or failing to file a grievance in the precise manner prescribed by DOCCS as a result of threats. *See, e.g., Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (failure to exhaust was justified where plaintiff inmate's interpretation of regulations was reasonable and prison official threatened inmate).

## IV. ANALYSIS

### A. Defendants Established the Availability of the Inmate Grievance Program and Plaintiff's Failure to Exhaust Administrative Remedies

Defendants established that an IGP was available to Plaintiff by an administrative process through which inmates could seek an internal review of any complaint regarding the conditions of prison life. (T. at 7–9, 26; *see also* Ex. D–9.) In accordance with the program, an inmate must submit a complaint on a grievance form or on plain paper to the prison staff where the inmate is housed, and staff must attempt to informally resolve the complaint. *Id.* at 36; *see also* Ex. D–9. If there is no informal resolution, the IGRC hears the complaint. *Id.* If an inmate is dissatisfied with the decision of the IGRC, the next step is an appeal to the superintendent. *Id.* at 7–9, 26; *see also* Ex. D–9. If that request is denied, the inmate must next appeal to CORC. *Id.* If the grievance involves a claim of misconduct by staff, harassment or discrimination, it receives the code of 49. A copy with the grievance number assigned on it goes to the inmate, and the grievance is handled expeditiously by passing through the IGRC and going directly to the superintendent of the facility. *Id.* at 15, 27, 34–35. Directive 4040, which sets forth these steps in the inmate grievance process, was identified by Defendants' witnesses as the controlling grievance program document for all DOCCS facilities

during the relevant time period. *Id.* at 7, 26; *see also* Ex. D–9.

***10** Inmates learned about the grievance process during orientation at the facility in which they are housed. *Id.* at 45–46. Inmates in the SHU were given a SHU manual during orientation to the SHU which included information about the IGP. *Id.* at 119–120; Ex. D–4 at p. 20. Directive 4040 (Ex. D–9) is available to inmates in facility libraries and inmates in SHU can request a copy and get it. *Id.* at 45–46. Plaintiff was aware of the grievance process and Directive 4040 and had submitted grievances "plenty of times." *Id.* at 69, 93.

The IGP supervisor at Clinton testified that she searched the inmate grievance database at that facility and did not find any grievances filed by Plaintiff during the period of October 2005 through January 2006. *Id.* at 30–31. She specifically did not find any grievance from Plaintiff regarding an event of November 20, 2005. *Id.* The Director of the IGP for DOCCS searched the DOCCS' Central Office records and did not locate any appeals to CORC submitted by Plaintiff, or any grievances or appeals submitted by Plaintiff at Clinton in November of 2005 concerning any events that may have occurred there during that time. *Id.* at 10; *see also* Ex. D–11. Plaintiff did not have any active or closed appeals on file with CORC. *Id.; see* Ex. D–11. However, the February 1, 2006, letter to Plaintiff from Eagan informing Plaintiff he could not refer a grievance directly to CORC was located. *Id.* at 11–12; Ex. D–8.

In his Complaint, Plaintiff alleged that he attempted to exhaust his administrative remedies but that "prison officials hampered and intervened with his filing of a complaint...." (Dkt. No. 1 at ¶ 4.) He testified inconsistently that he gave either two or three grievances to Sergeant "Mano or Manos" who collected the mail, and that the grievances never made it to the mailbox. (T. at 59, 80–83.) He then identified Sergeant "Mano or Manos" as Sergeant Menard at the hearing and indicated the Sergeant ripped up the grievances in front of him without putting them in the mailbox. *Id.* at 57–59, 79, 81–83, 86–87. In his opposition to the motion for summary judgment, Plaintiff indicated he submitted "a grievance" about the November 20, 2005 incident, and that the Sergeant removed it from the mailbox and ripped it up. *Id.* at 84, *see also* Ex. D–14 at ¶ 16. He claimed he was threatened about filing grievances by Sergeant Menard and other unidentified staff members. *Id.* at 78.

Plaintiff did not produce copies of the two or three grievances he said he attempted to submit, but he did produce a handwritten grievance dated November 28, 2005. *See* Ex. P–4. He claimed it was the grievance he tried to submit at Clinton. *Id.* at 69–71, 91–92. Notably, the October 22, 2013, exhaustion hearing was the first time Plaintiff submitted this handwritten grievance, despite being asked for copies of grievances at his deposition, and in a follow up letter after his deposition. *Id.* at 72–73; Ex. D–13 and D–14. Additionally, even though Plaintiff had been given nine months to respond to Defendants' summary judgment motion which sought dismissal of the Complaint for failure to exhaust administrative remedies, he failed to submit the handwritten grievance (Ex. P–4) in opposition to the motion. *Id.* at 77; Ex. D–14. The handwritten grievance submitted by Plaintiff did not bear any grievance code or grievance number. Ex. P–4.

***11** The Defendants' witness, Lieutenant Menard, testified that all inmates in the SHU at Clinton are provided with writing paper and a mini-pen upon admission, which is consistent with information in the SHU Orientation Manual. *Id.* at 121–122; Ex. D–4 at p. 6. However, Plaintiff testified he was not given a pen or paper at the Clinton SHU and was thus not able to prepare grievances until he obtained writing materials from the inmate next to him. *Id.* at 55–56. Plaintiff claimed to have also obtained carbon copy paper from that inmate and to have made copies of the grievances. However, he had no copies of the two or three grievances he tried to submit. *Id.* at 60–61.

Plaintiff clearly testified he was aware of the grievance process and of Directive 4040. *Id.* at 69. He had submitted grievances "plenty of times." *Id.* at 93. Plaintiff's last minute production of a handwritten grievance (Ex. P–4) is insufficient to credibly show that he attempted to file a grievance concerning the November 20, 2005, incident. Neither the IGP supervisor at Clinton nor the DOCCS' Director of the IGP had any record of a grievance or appeal filed by Plaintiff regarding an event of November 20, 2005. *Id.* at 10, 30–31; *see also* D–11. There was no record of any complaints about his grievances being ripped up or not reaching their destination, nor did he report any problems with grievances to the IG investigator. *Id.* at 146; *see also* Ex. D–12A and 12B.

Plaintiff did not have any active or closed appeals on file with CORC. *Id.* at 10. While the February 1, 2006, letter to Plaintiff from the previous DOCCS' Director of the IGP indicates that Plaintiff wrote to CORC on January 2, 2006, it is clear from the letter that there was no record of a grievance first filed at the facility level. Ex. D–8. Thus, the Court finds that Defendants met their burden of showing that administrative remedies were available to Plaintiff, and that Plaintiff failed to exhaust those remedies. *See Woodford,* 548 U.S. at 90 (the PLRA requires "proper exhaustion"-"using all steps that the agency holds out, and doing so properly so that the agency addressed the issues on the merits.").

### B. Plaintiff's Claims of Unavailability and Special Circumstances

Under the *Hemphill* analysis, the Court now turns to whether Plaintiff has shown exhaustion unavailability or special circumstances. Availability of ordinary grievance procedures is an objective test of whether the similarly situated individual would have deemed them available. *Hemphill,* 380 F.3d at 688. Plaintiff argued at the hearing that he was unable to pursue a grievance because he was not given a pen or paper to prepare a grievance. At the same time, Plaintiff claims that he tried to submit two or three grievances (his testimony was inconsistent), but Sergeant Menard ripped them up when collecting the mail. (T. at 55–59, 79, 81–83, 86–87.)

Plaintiff also testified that he did not attempt to give grievances to any other prison official because he was on the floor of his cell and too weak to get up, or he was threatened by Sergeant Menard. *Id.* at 78, 94–96. Yet he spoke to an investigator from the IG's office and could not recall disclosing that someone was ripping up his grievances. *Id.* at 97, 107–109. Furthermore, he previously indicated that his "mail may not have reached its destination," not that it was being ripped up. *Id.* at 88; *see also* Ex. D–7.

***12** In contrast, Menard testified that the mail was picked up on a daily basis in the SHU, but that he did not push the mail cart. *Id.* at 120–122,139. Unit counselors made rounds on the SHU every day, and other staff including nurses, chaplains, the grievance supervisor, and executive staff routinely made rounds in the SHU. *Id.* at 131–135. The SHU sign in log book showed that various staff members made visits to the SHU on a regular basis from November 20, 2005, to January 10, 2006. *Id.; see also* Ex. D–5. Inmates could give grievances to any of the staff making rounds including executive staff. *Id.* at 135–136. The SHU log book shows that grievance Sergeant Giambruno made rounds there within fourteen days of November 20, 2008, on December 2, 2005. *Id.* at 135; *see also* Ex. D–5.

Brousseau, the Clinton IGP supervisor, also testified that the grievance sergeant makes rounds in the SHU and inmates housed there can report any grievances or problems with the program to that officer. (T. at 48.) She too confirmed that the SHU sign in log book reveals that a grievance office sergeant, Sergeant Giambruno, visited the SHU within fourteen days after the incident of November 20, 2005. *Id.* at 47–48; *see also* Ex. D–5. Additionally, if an investigator from the IG's office is involved in an investigation, an inmate could report any grievance or problems with the grievance program to that investigator. *Id.* at 32.

IG Deputy Miller reviewed the IG's file regarding Plaintiff which revealed an internal affairs investigation regarding the November 20, 2005, incident. *Id.* IG investigator Reichelt interviewed Plaintiff on December 8, 2005, and prepared a report of the interview. *Id.* at 144–145; *see also* Ex. D–12A and D–12B. The SHU log book confirms Reichelt was on the unit from 1:55p.m. to 2:20p.m. on that day. Ex. D–5. Reichelt's report does not indicate that Plaintiff complained of grievances being ripped up or destroyed by staff at Clinton. *Id.* at 146; *see also* Ex. D–12A and D–1213. The report indicates Plaintiff was threatened and "embarrassed to say anything before seeing [the investigator]" which implies he had not attempted to file any grievance. Ex. D–1213. If Plaintiff had complained of grievances being destroyed, that allegation would have been added to the investigation, and video of the location where the destruction occurred would have been reviewed for the relevant time and date to see if such destruction was indeed happening. *Id.* at 148. The investigator also looks for any grievances filed at the facility. *Id.* at 146–147.

Clinton legal office clerk Irwin testified that a superintendent/security file is maintained for inmates at Clinton which would contain letters by inmates to the superintendent, and any kind of code 49 investigation documents. *Id.* at 113–114. She searched for a file regarding Plaintiff and found only a copy of a letter to Plaintiff from Eagan dated February 1, 2006; that

letter indicates by a stamp that it was received in the superintendent's office on February 6, 2006. *Id.* at 114–115; *see also* Ex. D–8. She did not find any letter from Plaintiff to the superintendent or any other correspondence in the superintendent/security file. *Id.* at 113.

***13** The Court does not find Plaintiff's testimony credible regarding his claims that he was denied writing materials, that he attempted to submit grievances, or that he was too weak to get up off the floor of his cell to report his grievance to other prison officials. His testimony is inconsistent with the record as a whole, as well as with his prior testimony and submissions to the Court in his pleadings and on summary judgment. *See* Dkt. No.1; Ex. D–14. Furthermore, he failed to mention any problem with filing a grievance to the investigator from the IG's office who clearly spoke to him about the November 20, 2005, incident and that conversation occurred within the fourteen day time frame to file a grievance.

Even if Plaintiff's testimony were credited, in order to prevail on an argument that the grievance procedure was not available to him, or that there were special circumstances because the officials did not file the grievances, Plaintiff must show that he nonetheless followed the grievance procedure through all of the steps in the DOCCS' regulations. *See, e.g., Belile v. Griffin,* No. 9:11–CV–0092 (TJM/DEP), 2013 WL 1776086, at *3–4, 7, 2013 U.S. Dist. LEXIS 47137, at * 10, 22–23 (N.D.N.Y. Feb.12, 2013) (plaintiff failed to exhaust his administrative remedies because he had not followed through on all of the steps, *i.e.,* he did not appeal to the superintendent of the facility or appeal any unfavorable decision of the superintendent to CORC; plaintiff alleged he had filed two grievances by placing the grievances in his meal slot to be filed by corrections officers, but claimed they were intercepted or discarded, and never received a determination on the grievances); *Veloz v. New York,* 339 F.Supp.2d 505, 516 (S.D.N.Y.2004) ("[P]laintiff's allegation that these particular grievances were misplaced or destroyed by correctional officers ultimately does not relieve him of the requirement to appeal these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming."), *aff'd,* 178 F. App'x 39 (2d Cir.2006); *Atkins v. Menard,* No. 9:11–CV–0366 (GTS/DEP), 2012 WL 4026840, at *4, 2012 U.S. Dist. LEXIS 130059, *13 (N.D.N.Y. Sept.12, 2012) (finding that plaintiff failed to exhaust where he had the "ability, and indeed the duty, to appeal the IGRC's nonresponse (to his grievance) to the next level, including CORC, to complete the grievance process."); *Murray v. Palmer,* No. 03–CV–1010, (DNH/GLS), 2008 WL 2522324, at *16, 18, 2008 U.S. Dist. LEXIS 47933 (N.D.N.Y. June 20, 2008) (finding that in order to exhaust available administrative remedies with regard to his grievance, plaintiff had to file an appeal with the superintendent from the IGRC's non-response, which included a failure to acknowledge the receipt of a grievance and assign it a number); *Midalgo v. Bass,* No. 03–CV1128 (NAM/RFT), 2006 WL 2795332, at *7, 2006 U.S. Dist. LEXIS 98871, at *16–17 (N.D.N.Y. Sept.26, 2006) (observing that plaintiff was required to seek an appeal to the superintendent, even though he never received a response to his grievance and was not assigned a grievance number); *Gill v. Frawley,* No. 02–CV–1380, 2006 WL 1742738, at *11 & n. 77, 2006 U.S. Dist. LEXIS 41984 (N.D.N.Y. June 22, 2006) (Lowe, M.J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Waters v. Schneider,* No. 01 Civ 5217(SHS), 2002 WL 727025, at *2, 2002 U.S. Dist. LEXIS 7166, at *4–5 (S.D.N.Y. Apr. 23, 2002) (finding that in order to exhaust administrative remedies, plaintiff had to file an appeal with the superintendent from IGRC's non-response to his grievance, of which no record existed). Plaintiff has failed to make that showing.

***14** The superintendent/security file maintained at Clinton did not contain any record of Plaintiff ever submitting a letter to the superintendent. (T. at 113.) Plaintiff initially testified he sent a letter to the superintendent on January 2, 2006, and that it was substantially the same as the letter he sent that very same day to CORC. *Id.* at 64. However, in the letter he sent to CORC on January 2, 2006, which was received by CORC on January 6, 2006, he indicated that he attempted to file with the facility grievance department and the superintendent, but had "not received a response from either office." Ex. D–7. Plaintiff later testified that he sent a letter to the superintendent sometime between the date of the incident, November 20, 2005, and when he moved to Southport Correctional Facility on January 12, 2006. *Id.* at 90–91; *see also* Ex. D–6. He also acknowledged that he had no documentation to show that he tried to send

a grievance to the superintendent before January 2, 2006. *Id.* at 92.

Based upon this testimony and the record as a whole, the Court finds Plaintiff has not plausibly shown, at the very least, that he filed or even attempted to file a grievance with the superintendent of Clinton. Since Plaintiff has not shown he followed all of the steps of the grievance process, he has not properly exhausted his administrative remedies and therefore cannot prevail on his claims of unavailability or special circumstances.

### C. Plaintiff's Claim of Estoppel

Although Plaintiff has not specifically claimed that Defendants are estopped from raising the exhaustion defense, the court *sua sponte* finds the testimony does not support an estoppel. Plaintiff's testimony is that he gave the grievances to Menard and that he was threatened by Menard. *Id.* at 57–59,78–79. However, there was absolutely no evidence presented showing that the named Defendants in this case threatened Plaintiff, prevented the grievances from being filed, or did not provide Plaintiff with writing materials. As such, Plaintiff has failed to show Defendants should be estopped from asserting Plaintiff failed to exhaust his administrative remedies. *Murray,* 2010 WL 1235591, at *5 & n. 26 (collecting cases); *McCloud,* 2008 WL 1772305, at *12 ("None of those documents allege facts plausibly suggesting that Defendant's own actions inhibited Plaintiff's exhaustion of remedies during the time in question.").

### V. CONCLUSION

Based upon the evidence presented at the hearing, the Court recommends that Plaintiff's Complaint be dismissed with prejudice and without addressing its merits because an administrative grievance process was available to him and he failed to exhaust those administrative remedies. Plaintiff was not prevented by the actions of prison officials, including the named Defendants, from filing a grievance or from pursuing his administrative remedies, including appealing to the superintendent of the relevant corrections facility and appealing to CORC. He has offered no credible special circumstances to excuse his failure to exhaust administrative remedies.

***15** Where a claim is dismissed for failure to exhaust administrative remedies, dismissal without prejudice is appropriate if the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 86–87 (2d Cir.2004). However, if a prisoner has failed to exhaust administrative remedies or provide a valid excuse for failure to do so, and the time in which to exhaust has expired, it is proper for the court to dismiss the complaint with prejudice because any attempt to exhaust would be futile. *Id.* at 86; *see also Hilbert v. Fischer,* No. 12 Civ. 3843(ER), 2013 WL 4774731, at *7,. LEXIS 126881, at *23–24 (S.D.N.Y. Sept. 4, 2013) (where the time to file a grievance and request an exception to the time limit has long since expired, and plaintiff has failed to establish an excuse for his failure to exhaust, dismissal with prejudice is proper). Because Plaintiff has failed to establish a credible excuse for his failure to exhaust, the Court recommends that the dismissal of his Complaint be with prejudice.

**ACCORDINGLY,** it is hereby

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) in this action be **DISMISSED,** with prejudice, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a); and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of all unpublished decisions cited in this Order in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (*per curiam* ).

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2807532

Footnotes

1 The record in this case contains a variety of spellings for the name 1 me of Defendant Jolicoen. Compare Dkt. No. 1 ("Jolicoen") with Dkt. No. 11–3 ("Joliocouer") and Dkt. No. 45 ("GJolicoeur"). In this Report–Recommendation, I have used the spelling listed on the docket.

2 Attorney Christopher R. Smith, Esq., of the Hancock Estabrook, LLP Law Firm was appointed as *pro bono* counsel for Plaintiff on August 23, 2013. (Dkt. No. 56.) The Court expresses its gratitude to Attorney Smith for his selfless, zealous, learned and industrious representation on behalf of Plaintiff in this matter.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

3 DOCCS was formerly known as the Department of Correctional Services ("DOCS"). It will be referred to as DOCCS herein regardless of the time frame referenced.

4 In his opposition to the Defendants' motion for summary judgment, he claimed he submitted "a grievance." Ex. D–14 at ¶ 16.

5 The Court will provide Plaintiff with copies of all unpublished decisions cited in this Order in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (*per curiam* ).

6 During the relevant time period involved in this case in November of 2005, grievances were to be filed within fourteen days of an occurrence. *See* Ex. D–9.

7 Subsequent to *Hemphill,* the Supreme Court decided *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.* at 83–84. The Supreme Court resolved the question in the negative, explaining that the PLRA requires "proper exhaustion"—"using all steps that the agency holds out, and doing so properly (so that the agency addressed the issues on the merits)." *Id.* at 90 (citation omitted). Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill survived Woodford,* the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g., Amador v. Andrews,* 655 F.3d 89, 102–03 (2d Cir.2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense).

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.


H

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Thomas GOODSON, Plaintiff,

v.

"John" SILVER, Sergeant, Clinton Corr. Facility; and "John" Renadette, Corr. Officer, Clinton Corr. Facility, Defendants.

No. 9:09–CV–0494 (GTS/DRH).

Sept. 25, 2012.

Hiscock & Barclay LLP, Brittany E. Aungier, Esq., Gabriel M. Nugent, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Cathy Y. Sheehan, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

***MEMORANDUM–DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

***1** The trial in this prisoner civil rights action, filed *pro se* by Thomas Goodson ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on September 18, 2012, regarding the affirmative defense, asserted by Sergeant "John" Silver and Corrections Officer "John" Renadette ("Defendants"), that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on March 12, 2009. At the hearing, documentary evidence was admitted, and testimony was taken. At the conclusion of the hearing, the undersigned dismissed Plaintiff's action for failure to exhaust his available administrative remedies, and indicated that a written decision would follow. This is that written decision.

**I. RELEVANT BACKGROUND**

Through their pre-hearing briefs and hearing summation, the parties have demonstrated an accurate understanding of the claims and factual allegations asserted in Plaintiff's Complaint, the relevant portions of the procedural history of this action, and the legal and factual issues relevant to the hearing. As a result, the Court will not repeat that information in its entirety in this Decision and Order, which is intended primarily for the review of the parties. Rather, the Court will merely state as follows.

Plaintiff dated, and thus filed, his Complaint in this action on March 12, 2009. (Dkt. No. 1.) Construed with the utmost of special liberality, that portion of Plaintiff's Complaint surviving the Court's Decision and Order of March 27, 2012, alleges that on April 4, 2006, at Clinton Correctional Facility ("Clinton C.F."), the two above-captioned Defendants violated his constitutional rights in the following manner: (1) Defendant Silver sexually assaulted Plaintiff in a bathroom while escorting him to a physical therapy appointment, in violation of the Eighth Amendment; and (2) Defendant Renadette failed to protect Plaintiff from the alleged sexual assault, by knowing of Defendant Menard's physical threat against Plaintiff, by having reason to know that Defendant Silver intended to harm Plaintiff, but failing to accompany Plaintiff into the bathroom during his transport to physical therapy, in violation of the Eighth Amendment. (*See generally* Dkt. Nos. 1, 49.)

On May 11, 2012, Plaintiff was appointed pro bono trial counsel. (Dkt. No. 50.) On August 7, 2012, Defendants filed a letter-motion requesting a pre-trial evidentiary hearing regarding Plaintiff's asserted failure to exhaust his available administrative remedies before filing this action. (Dkt. No. 57.) On August 10, 2012, the Court granted that request. (Text Order filed Aug. 10, 2012.)

Generally, in their pre-hearing brief, and during their hearing summation, Defendants argued as follows: (1) the Supreme Court's decision in *Woordford v. Ngo,* 548 U.S. 81, 92–93 (2006), required Plaintiff to have "properly" exhausted his available administrative remedies before filing this action (i.e., complete the administrative review process in accordance with the applicable procedural

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

rules, including deadlines); and (2) Plaintiff did not do so in this case, in large part because an investigation by the New York State Office of the Inspector General does not suffice to exhaust administrative remedies without an appeal to the New York State Department of Corrections and Community Supervision ("DOCCS") Central Office Review Committee ("CORC"). (Dkt. No. 76, at 4–6 [attaching pages "4" through "6" of Defs.' Pre–Hrg. Brief]; Hrg. Transcript, at 122–129.)

***2** Generally, in his pre-hearing brief, and during their hearing summation, Plaintiff argued that, pursuant to the third part of the three-part inquiry established by the Second Circuit for exhaustion of administrative remedies, special circumstances exist justifying Plaintiff's failure to exhaust his available administrative remedies before filing this action, due to the following: (1) the purported fact that (due to fear of reprisal) his speech was chilled, or at least he was hopelessly distracted, while he was at Clinton C.F. following the alleged assault; (2) the purported fact that his mail was interfered during the two days following the alleged assault; (3) the purported fact that, procedurally, he could not file a formal grievance at Clinton C.F. after he was transferred from there; (4) the fact that his hand-delivered letter to Maureen Bosco, which was brought to the attention of Clinton C.F. Deputy Superintendent of Security Jeff Tedford and referred by him to the IG, was effectively treated as a harassment grievance; (5) the purported fact that an appeal to CORC would have been futile under the circumstances because CORC would merely have "rubber stamped" the IG's conclusion that Plaintiff's claims were unsubstantiated; and (6) the purported fact that the IG investigation served the same purpose as the grievance process. (Dkt. No. 68, at 5–8 [attaching pages "3" through "6" of Plf.'s Pre–Hrg. Brief]; Hrg. Transcript, at 129–131.)

Generally, at the hearing, documentary evidence was admitted, and testimony was taken of Plaintiff as well as Defendants' five witnesses (Grievance Sergeant Scott McLean, Grievance Supervisor Christine Gregory, Legal Office Liaison Tammy Irwin, Inmate Grievance Program Director Karen Bellamy, and Inspector General Senior Investigator Anthony Misercola). (*See generally* Hrg. Transcript and Exs.) While various facts were of course were disputed, certain facts were uncontroverted, including the following: (1) before the occurrence of the assault alleged in this action, Plaintiff had a good understanding of the DOCCS grievance process, and had some experience filing an appeal to CORC, having done so two times, regarding different subjects, and having written to CORC a third time about a perceived failure to respond to an appeal; (2) the assault is alleged to have occurred on April 4, 2006, at Clinton C.F.; (3) at the time, Plaintiff was housed in the Clinton C.F. Special Housing Unit ("SHU"), where paper and grievance forms were available to him; (4) on or about April 7, 2006, Plaintiff had Office of Mental Health ("OMH") Social Worker Todd Asselin hand-deliver a letter to OMH Unit Chief Maureen Bosco complaining of the alleged assault; (5) on or about April 12, 2006, Plaintiff was transferred to the Clinton C.F. Mental Health Center for observation; (6) on or about April 19, 2006, Plaintiff was transferred to the Central New York Psychiatric Center ("CNYPC"), where he orally complained of the alleged assault to a risk management specialist on or about April 21, 2006; (7) on or about April 24, 2006, Plaintiff's complaint of an alleged assault was referred to the New York State Department of Correctional Services Inspector General's Office ("IG") for an investigation; (8) the investigation was conducted by IG Senior Investigator Anthony Misercola; (9) on or about May 17, 2006, Plaintiff was transferred to Downstate Correctional Facility, and the next day to Great Meadow Correctional Facility; and (10) on or about September 20, 2006, after the IG's investigation was over, the IG concluded that Plaintiff's allegations were unsubstantiated. (*Id.*)

## II. RELEVANT LEGAL STANDARD

***3** The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524–25

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

(2002). In this regard, exhaustion serves two major purposes. First, it protects “administrative agency authority” by giving the agency “an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures.” *Woodford v. Ngo,* 548 U.S. 81, 89 (2006). Second, exhaustion promotes efficiency because (a) “[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court,” and (b) “even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration.” *Woodford,* 548 U.S. at 89. “[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.” *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services (“DOCS”) has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program (“IGP”) involves the following threestep procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7.[FN1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[FN2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee (“IGRC”) has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee (“CORC”) within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

FN1. *See also Murray v. Palmer,* 03–CV–1010, 2010 WL 1235591, at *1 & n. 1 (N.D.N.Y. March 31, 2010) [citation omitted].

FN2. The Court uses the term “a certain number of days” rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

***4** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above; however, all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. The superintendent or his designee shall “promptly determine whether the grievance, if true, would represent a bona fide case of harassment,” and if so, then the superintendent shall initiate an investigation of the complaint, either “in-house,” by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure.

It is important to note that these procedural requirements contain certain safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[FN3]

FN3. *See Murray v. Palmer,* 03–CV–1010, 2010 WL 1235591, at *2 & n. 3 (N.D.N.Y. March 31,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2010) (citing *Groves v. Knight,* 05–CV–0183, Decision and Order at 3 [N.D.N.Y. filed Aug. 4, 2009], an appeal from which was subsequently dismissed as frivolous, *see Groves v. Knight,* No. 09–3641, Mandate [2d Cir. filed Jan. 15, 2010].)

Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process.FN4 There appears to be a conflict in case law regarding whether the IGRC's or superintendent's non-response must be appealed to the next level where the inmate's grievance was never assigned a grievance number.FN5 After carefully reviewing this case law, the Court finds that the weight of authority persuasively answer this question in the affirmative.FN6 The Court notes that, if the inmate adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

FN4. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *see also Murray v. Palmer,* 03–CV–1010, 2010 WL 1235591, at *2 & n. 4 (N.D.N.Y. March 31, 2010) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process.") [collecting cases]; *see also Williams v. Hupkowicz,* 04–CV–0051, 2007 WL 1774876, at *4 (W.D.N.Y. June 18, 2007) ("Even assuming that an inmate received no timely official response as contemplated by the regulations to a grievance at any stage in the inmate grievance process, the inmate could nevertheless appeal such grievance to the next level, and the failure to do so constitutes a failure to exhaust his administrative remedies as required under the PLRA.").

FN5. *Murray,* 2010 WL 1235591, at *2 & n. 5 [citing cases].

FN6. *See, e.g., Murray v. Palmer,* 03–CV–1010, 2008 WL 2522324, at *15, 18 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.) ("[E]ven if Great Meadow C.F. did not (during the time in question) have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level."), *accord, Midalgo v. Bass,* 03–CV–1128, 2006 WL 2795332, at *7 (N.D.N.Y.Sept.26, 2006) (Mordue, C.J., adopting Report–Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06–CV–0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Wesley v. Hardy,* 05–CV–6492, 2006 WL 3898199, at *4 (S.D.N.Y. Dec. 12, 2006) ("If a prisoner submits a grievance and receives no response, he cannot be considered to have been actively obstructed or frustrated, as he is free to appeal to the next level of review."), *accord, Walters v. Carpenter,* 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004); *Veloz v. New York,* 339 F.Supp.2d 505, 515–16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *Hernandez v.. Coffey,* 99–CV–11615, 2003 WL 22241431, at *4 (S.D.N.Y. Sept. 29, 2003) (rejecting plaintiff's argument that he could not have exhausted because he never received a grievance number,

Page 5

Slip Copy, 2012 WL 4449937 (N.D.N.Y.)

(Cite as: 2012 WL 4449937 (N.D.N.Y.))

finding he could nonetheless have appealed any such non-response to the next level); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002) ("Had plaintiff utilized this procedure, any failure by Artuz to render a decision on his matter within twelve working days could have been appealed to Albany, thus completing the grievance cycle and exhausting his remedies in a matter of weeks."), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

Generally, if a prisoner has failed to follow each of the required three steps of the abovedescribed grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

***5** Finally, two points bear mentioning regarding exhaustion hearings. First, the Second Circuit has ruled that a plaintiff in a lawsuit governed by PLRA is not entitled to a jury trial on disputed factual issues relating to his exhaustion of administrative remedies; rather, PLRA exhaustion is a matter of judicial administration. *Messa v. Goord,* 652 F.3d 305, 308–10 (2d Cir.2011). Second, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies.[FN7] However, once a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then "counter" the defendant's assertion by showing exhaustion, unavailability, estoppel, or "special circumstances."[FN8] As a result, practically speaking, while the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it.

FN7. *Murray,* 2010 WL 1235591, at *4 [citation omitted].

FN8. *Id.* at *4 & n. 17 [collecting cases].

### III. ANALYSIS

As an initial matter, the Court finds, after carefully considering the matter, that, before filing this action, Plaintiff did not exhaust his administrative remedies. For example, Plaintiff did not file a harassment grievance and then either (1) receive a decision on that grievance or (2) appeal the denial of, or non-response to, that grievance to CORC. The Court bases this finding on the following: (1) the conspicuous omission of any reference to the grievance process in Plaintiff's otherwise detailed verified

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Complaint; (2) DOCCS' log of Plaintiff's grievances while at Clinton C.F.; (3) DOCCS' log of Plaintiff's grievance appeals to CORC; (4) the hearing testimony of Grievance Supervisor Christine Gregory; (5) the hearing testimony of Legal Office Liaison Tammy Irwin; and (6) the hearing testimony of Inmate Grievance Program Director Karen Bellamy. (Dkt. No. 1; Hrg. Exs. D–3E, D–4E; Hrg. Transcript, at 34–105.) FN9

FN9. The Court rejects as incredible Plaintiff's claim that, at some point in time during his stay at the CNYPC (i.e., between April 19, 2006, and May 17, 2006), he sent a letter to the Inmate Grievance Program Director Thomas Egan, who returned to Plaintiff a copy of that letter with the word "received" stamped on it, based on (1) Plaintiff's hearing testimony and demeanor during that testimony, and (2) the conspicuous absence of that copy in the record (despite Plaintiff's claim that he possesses it). (Hrg. Transcript at 117–121; *see* Hrg. Exs.) In any event, and more importantly, because there had been no referral to the IG by Superintendent Artus, such a letter, which preceded the conclusion of the IG investigation by more than four months, could not have constituted an "appeal" from that investigation to CORC. Even if there had been a referral to the IG by Superintendent Artus, Plaintiff's letter to Director Egan would not have been an "appeal" for two independent reasons: (1) it was untimely because it appears to have been submitted more than four working days after that referral on April 24, 2006 (and Plaintiff's knowledge of the referral through his being interviewed by IG Senior Investigator Anthony Misercola on the same day); and (2) in any event, it was never actually *decided* by CORC, but (purportedly) stamped "received" by Director Egan with the advice that Plaintiff file a grievance.

As a result, the Court turns its attention to three-part inquiry established by the Second Circuit for exhaustion of administrative remedies under the PLRA. As the Court indicated above in Part I of this Decision and Order, even when liberally construed, Plaintiff's pre-trial brief and hearing summation do not take issue with either parts one or two of that three-part inquiry; rather, they take issue only with part three of that inquiry. (*See generally* Dkt. No. 68; Hrg. Transcript, at 129–131.) However, in the interest of thoroughness, and to give context to the Court's analysis regarding step three of that inquiry, the Court will analyze all three steps.

**A. Availability of Administrative Remedies**

With regard to part one of the Second Circuit's three-part exhaustion inquiry, the Court finds, after carefully considering the matter, that administrative remedies were in fact available to Plaintiff during the time in question.

***6** More specifically, during the time in question, Plaintiff had 14 days after the alleged assault (i.e., until April 18, 2006) to file a grievance at Clinton C.F. He could have done this by receiving a grievance form or piece of plain paper from a grievance housing specialist during his or her rounds or upon Plaintiff's request, and then handing a completed grievance form or simple letter of complaint written on plain paper (or even a napkin) to a grievance housing specialist or an SHU correctional officer during his or her rounds for delivery to the grievance clerk for filing, on any day between April 4, 2006, and April 18, 2006 (when he was transferred to the CNYPC). While Plaintiff could have preceded this filing with the sending of a letter to his assailant's supervisor (in an effort to informally resolve the matter before filing), he need not have done so. Alternatively, after he was transferred to the CNYPC on April 19, 2006, he could have written a letter to the grievance clerk at Clinton C.F. requesting an exception to the deadline of April 18, 2006, based on mitigating circumstances (e.g., his poor mental health and his transfer to the Clinton C.F. Mental Health Center for observation). The Court bases these findings on the following: (1) the hearing testimony of Grievance Sergeant Scott McClean; (2) the hearing testimony of Inmate Grievance Program Director Karen Bellamy; (3) the hearing testimony of Plaintiff; (4) the version of DOCs Directive 4040 in effect during the time in question; and (5) the relevant case law. (Hrg. Transcript, at 2–34, 58–88, 106–121; Hrg. Ex. D–2E [attaching version of Directive 4040 dated July 12, 2006, which Sgt. McClean testified was "very, very close" to the version in effect before July 12, 2006].) FN10

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Slip Copy, 2012 WL 4449937 (N.D.N.Y.)

(Cite as: 2012 WL 4449937 (N.D.N.Y.))

FN10. *See also* *Hale v. Rao,* 768 F.Supp.2d 367, 376, n. 5 (N.D.N . Y.2011) (Hurd, J.) ("This requirement [that a grievance be filed within 14 days of the incident] was amended on July 12, 2006, by another DOCS directive that extended the deadline to within 21 days of the incident."); *Barnes v. Craft,* 04–CV–1269, 2007 WL 1017307, at *4 (N.D.N.Y. March 30, 2007) (Report–Recommendation of Lowe, M.J., adopted by Mordue, C.J.) (finding that the deadline for filing a grievance, for incident occurring on March 12, 2004, was 14 days of the incident); *Carini v. Austin,* 06–CV–5652, 2008 WL 151555, at *1 & n. 3 (S.D.N.Y. Jan. 14, 2008) (finding that the deadline for filing a grievance, for incident occurring on August 1, 2003, was 14 days of the incident).

Once his grievance was received, it would have been deemed to have been a harassment grievance and would have been forwarded directly to the Superintendent by the close of that business day. The Superintendent then would have had 12 working days in which to respond, unless he requested (and obtained Plaintiff's consent for) an extension of the response deadline, due to additional time needed for the completion of (1) an in-house investigation, (2) an investigation by IG, or (3) an investigation by the State Police. The Court bases these findings on the following: (1) the hearing testimony of Grievance Sergeant Scott McClean; (2) the hearing testimony of Inmate Grievance Program Director Karen Bellamy; (3) the version of DOCs Directive 4040 in effect during the time in question; and (4) the relevant case law. (Hrg. Transcript, at 2–34, 58–88; Hrg. Ex. D–2E.) [FN11]

FN11. *See also* *Rodriguez v. Mount Vernon Hosp.,* 09–CV–5691, 2010 WL 3825736, at * 10 & n. 14 (S.D.N.Y. Sept. 7, 2010) ("The pre–2006 version of the regulations allowed the Superintendent 12 working days to render a decision [to a harassment grievance], as opposed to 25 calendar days under the current regulation."), *adopted by* 2010 WL 3825715 (S.D.N.Y. Sep 30, 2010); *Rhodes v. Hoy,* 05–CV–0836, 2007 WL 1343649, at *4 (N.D.N.Y. May 5, 2007) (Report–Recommendation of Peebles, M.J., adopted by Scullin, J.) (finding that the deadline for a superintendent's response to a harassment grievance filed on July 7, 2004, was 12 working days of receipt of the grievance); *Hairston v. LaMarche,* 05–CV–6642, 2006 WL 2309592, at *1, 7 (S.D.N.Y. Aug. 10, 2006) (finding that the deadline for a superintendent's response to a harassment grievance filed on June 18, 2004, was 12 working days of receipt of the grievance).

After 12 working days, if his grievance was either denied or not responded to (and no extension was requested by the Superintendent and consented to by Plaintiff), Plaintiff had four working days in which to appeal the Superintendent's denial of, or non-response to, that grievance to CORC. Alternatively, if the Superintendent sought an extension of his response deadline pending an investigation (e.g., by the IG), Plaintiff had four working days after the new response deadline in which to appeal the Superintendent's denial of, or non-response to, that grievance to CORC (assuming the grievance was not granted). In either case, he could have filed his appeal, and/or sought an extension of the deadline in which to do so, even if he had been transferred from the facility. The Court bases these findings on the following: (1) the hearing testimony of Inmate Grievance Program Director Karen Bellamy; (2) the version of DOCs Directive 4040 in effect during the time in question; and (3) the relevant case law. (Hrg. Transcript, at 58–88; Hrg. Ex. D–2E.) [FN12]

FN12. *See also* *Rodriguez,* 2010 WL 3825736, at *10 & n. 15 ("The pre–2006 version of the regulations required that appeals [from the response to a harassment grievance] be filed within four working days of receipt of the response, as opposed to seven working days under current law."); *Rhodes,* 2007 WL 1343649, at *4 (finding that the deadline for an inmate's appeal to CORC from a superintendent's response to a harassment grievance, as of July 7, 2004, was four working days of receipt of the response).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

***7** During the time in question, Plaintiff knew all of this, (1) having received an SHU Inmate Orientation Manual describing his access to the inmate grievance mechanism, (2) having been incarcerated in DOCS 16 years at that point, having previously filed two appeal to CORC (and a third letter to CORC regarding a perceived non-response to an appeal), and (3) admittedly having a "good understanding" of the grievance process. The Court bases these findings on the following: (1) the hearing testimony of Grievance Sergeant Scott McClean; (2) the SHU Inmate Orientation Manual; (3) the hearing testimony of Inmate Grievance Program Director Karen Bellamy; (4) DOCCS' log of Plaintiff's grievance appeals to CORC; and (5) the hearing testimony of Plaintiff. (Hrg. Transcript, at 2–34, 58–88, 106–121; Hrg. Exs. D–4E, D–8E.)

The Court would add only that it specifically finds that, during the time in question, an inmate could file an extension request and letter of complaint regarding an assault at Clinton C.F. while confined at the CNYPC, by mailing them there on plain paper. Granted, during the time in question, some transferred inmates' grievances of assault could *conceivably* have been denied as moot by *the IGRC* (and any appeal precluded)-if *the IGRC* determined that the grievance affected *only the specific grievant* as opposed to other members of the facility. *See* 7 N .Y.C.R.R. § 701.3(k)(2)(i),(ii) (version in effect in April 2006) ("If the IGRC majority determines that the [institutional] grievance is moot because it only affects the specific grievant ..., the IGRC shall dismiss and close the grievance ... If the grievance does affect other members of the facility population ..., the IGRC shall provide a recommendation or how to resolve the matter and forward the case to the superintendent for a determination.").[FN13] However, such a possibility does not render those inmates' administrative remedies unavailable to them.[FN14]

FN13. It bears noting that 7 N.Y.C.R.R. § 701.3(k)(2) was amended on June 13, 2006, so as to make it easier for an inmate to file a grievance from another facility. *See* 7 N.Y.C.R.R. § 701.6(h) (providing that "[a]n inmate transferred to another facility may continue an appeal of any grievance," and providing specific instructions on how to do so). Here, the relevant time period is before June 13, 2006.

FN14. *See* *Finger v. Superintendent McFinnis,* 99–CV–9870, 2004 WL 1367506, at *4 (S.D.N.Y. June 16, 2004) ("Plaintiff's perception of the unavailability of grievance procedures following transfer from a facility in which an incident occurred is inconsistent with the DOCS regulations, which provide that "[a]n institutional grievance brought by an inmate who was transferred, released, or paroled must be investigated and brought to an [Inmate Grievance Review Committee (IGRC) ] hearing" at the complainant's original facility. 7 N.Y.C.R .R. § 701.3(k)(2). Thus, removal from the facility where the alleged assault took place does not render grievance procedures unavailable."); *accord,* *Carini v. Austin,* 06–CV–5652, 2008 WL 151555, at *4 (S.D.N.Y. Jan. 14, 2008 (holding inmate's transfer from one DOCS facility to another in 2003 did not preclude him from filing a grievance at the original facility); *Sims v. Blot,* 00–CV–2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) ("The fact that plaintiff was moved from Sing Sing to the Auburn Correctional Facility does not, however, relieve him of the obligation to exhaust his administrative remedies in the facility where the incident occurred."); *Santiago v. Meinsen,* 89 F. Supp .2d 435, 440–41 (S.D.N.Y.2000) (holding inmate's transfer from one DOCS facility to another in does not relieve him from his duty to file a grievance at the original facility).

In any event, and more important, where, as here, the assault was of a sexual nature, the grievance would have been deemed to be a harassment grievance, and would have been forwarded directly and promptly to the superintendent. (Hrg. Transcript at 11, 18, 20–21, 26, 29, 40–41, 48, 64, 74–75; Hrg. Ex. D–2E.)

**B. Estoppel**

With regard to part two of the Second Circuit's three-part exhaustion inquiry, the Court finds, after carefully considering the matter, that Defendants did

nothing to estop themselves from asserting the affirmative defense of failure to exhaust administrative remedies.[FN15]

FN15. Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals. *Murray,* 2010 WL 1235591, at *5 & n. 26 [collecting cases].

While Plaintiff testified that he was scared following the alleged assault, the Court does not find that testimony credible. Even if the Court were to find that testimony credible, the Court would find that Plaintiff did not credibly testify-or indeed any way testify-that Defendants actually said anything to make him scared. The Court bases this finding on the following: (1) Plaintiff's criminal history as a sex offender and disciplinary history; (2) the fact that he purportedly tried to submit a grievance and two letters of complaint (one to the Superintendent and the other to OMH Unit Chief Maureen Bosco) a mere two days after the alleged assault; (3) the fact that he succeeded in hand-delivering a letter of complaint to OMH Social Worker Todd Asselin, for hand-delivery to Maureen Bosco, a mere three days after the alleged assault; and (4) the nature of Plaintiff's hearing testimony and his demeanor during that testimony. (Hrg. Transcript at 99–100, 106–121; Hrg. Exs. D–6E, D–10E, D–11E.)

***8** Similarly, while Plaintiff testified that his free flow of mail was interfered with during the two days following the alleged assault, the Court does not find that testimony credible. Even if the Court were to find that testimony credible, the Court would find that Plaintiff did not credibly testify-or indeed any way testify-that Defendants did anything to interfere with that mail. The Court bases this finding on the following: (1) the conspicuous absence of copies of the three pieces of mail in the record, (2) the hearing testimony, and investigative file, of IG Investigator Anthony Misercola; and (3) the nature of Plaintiff's hearing testimony and his demeanor during that testimony. (Hrg. Transcript at 88–121; Hrg. Exs. D–7E, D–10E.)

Finally, even if the Court were to find that Plaintiff was effectively prevented by Defendants from filing a grievance while he was at Clinton C.F., the Court would find that he was not prevented by Defendants (or anyone) from filing that grievance (or pursuing the appeal process) once he was transferred from Clinton C.F. The Court bases this finding on the following: (1) the hearing testimony of Grievance Sergeant Scott McClean; (2) the hearing testimony of Inmate Grievance Program Director Karen Bellamy; (3) the nature of Plaintiff's hearing testimony and his demeanor during that testimony; and (4) the version of DOCs Directive 4040 in effect during the time in question. (Hrg. Transcript at 2–34, 58–88, 106–121; Hrg. Ex. D–2E.) *See also* Part III.A. of this Decision and Order.

**C. Special Circumstances**

With regard to part three of the Second Circuit's three-part exhaustion inquiry, as stated above in Part I of this Decision and Order, liberally construed, Plaintiff's pre-trial brief and hearing summation argue that the special circumstances consist of a combination of some or all of the following six circumstances: (1) the purported fact that (due to fear of reprisal) his speech was chilled, or at least he was hopelessly distracted, while he was at Clinton C.F. following the alleged assault; (2) the purported fact that his mail was interfered during the two days following the alleged assault; (3) the purported fact that, procedurally, he could not file a formal grievance at Clinton C.F. after he was transferred from there; (4) the fact that his hand-delivered letter to Maureen Bosco, which was brought to the attention of Clinton C.F. Deputy Superintendent of Security Jeff Tedford and referred by him to the IG, was effectively treated as a harassment grievance; (5) the purported fact that an appeal to CORC would have been futile under the circumstances because CORC would merely have "rubber stamp[ed]" the IG's conclusion that Plaintiff's claims were unsubstantiated; and (6) the purported fact that the IG investigation achieved the same purpose as pursuing the grievance process. (*See generally* Dkt. No. 68; Hrg. Transcript, at 129–131.) After carefully considering the matter, the Cour rejects those circumstances (as grounds to excuse the exhaustion requirement), both individually and in their totality.

**1. First, Second and Third Circumstances Asserted by Plaintiff**

***9** With regard to the first two circumstances asserted by Plaintiff, the Court rejects those circumstances (as

grounds to excuse the exhaustion requirement) for the reasons stated above in Part III.B. of this Decision and Order. With regard to the third circumstance, the Court rejects that circumstance (as a ground to excuse the exhaustion requirement) for the reasons stated above in Part III.A. of this Decision and Order.

**2. Fourth Circumstance Asserted by Plaintiff**

With regard to the fourth circumstance asserted by Plaintiff (i.e ., that his hand-delivered letter to Maureen Bosco, which was brought to the attention of Deputy Superintendent of Security Tedford and referred by him to the IG, was effectively treated as a harassment grievance), at the end of the exhaustion hearing the Court indicated that it was preliminarily finding that it agreed with Plaintiff that the letter was effectively a harassment grievance. However, after carefully reconsidering the matter, the Court now disagrees with Plaintiff.

Section 701.8(d) of Directive 4040 expressly states that the request for an IG investigation (of a bona fide harassment issue) must directly come from "the superintendent." To liberally construe that term as meaning "the superintendent or his/her designee" would be to blatantly ignore the fact the preceding subsection, Section 701.8(c), intentionally uses the term "the superintendent or his/her designee," rendering that term's absence from Section 701.8(d) conspicuous. While the Court has not found any case law discussing the rationale for limiting the referral power to the superintendent, the Court imagines the rationale has to do with (1) the fact the time and expense of an IG investigation is not something that should be requested casually, and (2) the fact that limitation ensures that the superintendent has notice of the matter sufficient for him to render a decision to the grievant either before or after the IG investigation. This last fact is significant in this case, given that Legal Office Liaison Tammy Irwin testified that her review of Superintendent Artus' files revealed no indication that he knew of either Plaintiff's complaint or the referral *before* the referral occurred. (Hrg. Transcript at 51–58; *see* Hrg. Ex. P.9 at 55 [merely consisting of a fax from the IG to Superintendent Artus indicating that an interview would be conducted of Defs. Renadette but not stating Plaintiff's name and in any event being dated May 5, 2006, eleven days after the IG's investigation had begun].) This is not surprising because it appears that the referral to the IG came from Deputy Superintendent of Security Tedford, not from Superintendent Artus. (Hrg. Transcript at 90–92; Hrg. Exs. P–9, P–13.) [FN16]

FN16. The Court rejects as incredible Plaintiff's claim that he sent a separate letter of complaint directly to Superintendent Artus, based on (1) Plaintiff's hearing testimony and demeanor during that testimony, and (2) the conspicuous absence of a copy of that letter in the record (despite Plaintiff's claim that he possesses it). (Hrg. Transcript at 117–121; *see* Hrg. Exs.) In any event, and more importantly, Plaintiff claims Superintendent Artus never received that letter. (Hrg. Transcript at 117–120.)

District courts appear to uniformly agree that, without a referral from a superintendent, an IG's investigation of a matter and conclusion that it is unsubstantiated does not satisfy the exhaustion requirement; rather, the inmate must still appeal the IG's conclusion of unsubstantiation to CORC.[FN17] This is because Section 701.1(b) of the governing regulations explains that "[the inmate grievance] program is intended to supplement, not replace, existing formal or informal channels of problem resolution as set forth in section 701.3(a) of this Part." 7 N.Y.C.R.R. § 701.1(b).[FN18] As a result, the Second Circuit has held that the "[r]esolution of a matter through informal channels satisfies the exhaustion requirement...." *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001) (citing 7 N.Y.C.R.R. § 701.1).[FN19] District courts have interpreted this holding to mean that an inmate's efforts to resolve a matter through informal channels satisfies the exhaustion requirement only if the efforts resulted in the matter being concluded *in the inmate's favor.*[FN20] Generally, those district courts reason that, when a matter has been concluded in the inmate's favor, it has been resolved (for purposes of his available exhaustion remedies), because nothing exists from which the inmate can appeal.[FN21] Conversely, those district courts reason that, where informal efforts to resolve a matter have not resulted in the conclusion of the matter in the inmate's favor, the matter has not been resolved for purposes of his available exhaustion remedies, because he can still pursue the grievance process.[FN22]

FN17. *See, e.g., Stephenson v. Dunford,* 320

F.Supp.2d 44, 46, 52 (W.D.N.Y.2004) finding no exhaustion where inmate failed to pursue grievance all the way to CORC following investigation and finding of unsubstantiation by Inspector General), *vacated on other grounds,* 139 F. App'x 311 (2d Cir.2005); *Johnson v. Fernandez,* 09–CV–0626, 2011 WL 7629513, at *5 (N.D.N.Y. March 1, 2011) (Baxter, M.J.) (finding no exhaustion where inmate failed to pursue grievance all the way to CORC following investigation and finding of unsubstantiation by Inspector General), *adopted by* 2012 WL 1033652 (N.D.N.Y. Mar 27, 2012) (Scullin, J.); *Jacoby v. Phelix,* 07–CV–0872, 2010 WL 1839299, at *8–9 & n. 15 (N.D.N.Y. March 31, 2010) (Baxter, M.J.) (finding no exhaustion where inmate failed to pursue grievance all the way to CORC following investigation and finding of unsubstantiation by Inspector General), *adopted by* 2010 WL 1839264 (N.D.N.Y. May 06, 2010) (Hurd, J.); *Thomas v. Cassleberry,* 315 F.Supp.2d 301, 303–04 (W.D.N.Y.2004) (finding no exhaustion where inmate failed to pursue grievance all the way to CORC following "investig[ation] by [the] Inspector Gen[eral]"); *McNair v. Jones,* 01–CV–3253, 2002 WL 31082948 at *4, 8 (S.D.N.Y. Sept. 18, 2002) (finding no exhaustion where inmate failed to pursue grievance all the way to CORC following investigation and finding of unsubstantiation by Inspector General); *Houze v. Segarra,* 217 F.Supp.2d 394, 395–96 (S.D.N.Y.2002) (finding no exhaustion where inmate failed to pursue grievance all the way to CORC following IG's investigation and finding that there was "no merit to [the inmate's] allegations"); *Grey v. Spearhawk,* 99–CV–9871, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) (rejecting inmate's argument that "the Inspector General's investigation, if any, into the matter exhausts the administrative procedures"); *cf. Tapp v. Kitchen,* 02–CV–6658, 2004 WL 2403827, at *8 (W.D.N.Y. Oct. 26, 2004) ("Plaintiff's argument in this regard is further undercut by the fact that he never followed up on his complaint to the Inspector General after he failed to receive any kind of a decision."); *Velez v. Kulhmann,* 02–CV–6062, 2003 WL 22004899, at *3 (S.D.N.Y. Aug. 22, 2003) (finding no exhaustion where inmate failed to pursue grievance all the way to CORC following his complaint to an IG investigator).

FN18. Section 701.3(a) provides that "[a]n inmate is encouraged to resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." 7 N.Y.C.R.R. § 701.3(a).

FN19. *Accord, Perez v. Blot,* 195 F.Supp.2d 539, 545–46 (S.D.N.Y .2002) ("As in Marvin, the Plaintiff here also contends that he successfully obtained as favorable a resolution to his grievance as possible after he complained about the assault to 'correctional officials.' ... If the discovery requested in this instance ultimately supports Plaintiff's allegations, he may be able to establish that he resolved his grievance through precisely the type of informal channels which are permitted under both Marvin and the New York administrative scheme.").

FN20. *See, e.g., Thomas v. Cassleberry,* 315 F.Supp.2d 301, 304 (W.D.N.Y.2004) ("Both *Perez* and *Marvin,* then, merely stand for the proposition that a grievance through informal channels satisfies the exhaustion requirement if the prisoner thereby obtained a favorable resolution of his grievance.") (internal quotation marks omitted); *Muhammad v. Pico,* 02–CV–1052, 2003 WL 21792158, at *8, n. 23 (S.D.N.Y. Aug. 5, 2003) ("Here, there is no evidence in the record that Muhammad's informal complaints resolved matters in his favor, and so *Marvin* is inapplicable."); *Nelson v. Rodas,* 01–CV–7887, 2002 WL 31075804, at *3 n. 9 (S.D.N .Y. Sept. 17, 2002) ("Contrary to the dicta in *Perez v. Blot,* 195 F.Supp.2d 539, 544–46 (S.D.N.Y.2002), this Court construes *Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.2001), as holding merely that a grievance through informal channels satisfies the exhaustion requirement if the prisoner thereby obtained a favorable resolution of his grievance.").

FN21. *Abney v. McGinnis,* 380 F.3d 663, 229 (2d Cir.2004); *Andrews v. Cruz,* 2010 WL 1141182, at *6 (S.D.N.Y. Mar. 24, 2010).

FN22. *See* 7 N.Y.C.R.R. § 701.3(a) ("An inmate is encouraged to resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) *prior to submitting a grievance."* ) (emphasis added);*cf. See* *Percinthe v. Julien,* 08–CV–0893, 2009 WL 2223070, at *2 (S.D.N.Y. July 24, 2009) (indicating that inmate filed appeal to CORC following a finding of unsubstantiation by IG); *Ortiz v. Skinner,* 00–CV–07220, 2004 WL 2091994, at *1–2 (W.D.N.Y. Sept. 16, 2004) ("Director Eagen explains that 'if an inmate or someone on the inmate's behalf complains to the Office of the Inspector General, but the inmate does not file a grievance, the matter is never filed as a grievance and it cannot be appealed to CORC. Of course, the inmate can do both. However, if the inmate chooses to submit a complaint to the Office of the Inspector General and not to file a grievance, then the procedures set forth in Part 701 of Title 7 NYCRR and Directive # 4040 have been completely bypassed, and the inmate has not availed himself or herself of the IGP.'...").

***10** In any event, even if the letter was effectively a harassment grievance (that reached Superintendent Artus), that fact would not serve as a special circumstance justifying Plaintiff's failure to exhaust his available administrative remedies, because (following a denial of, or nonresponse to, that harassment grievance) an appeal to CORC was still possible. *See, supra,* Part II of this Decision and Order. (*See also* Hrg. Transcript at 31–32, 75–77, 83–85).[FN23]

FN23. *See also* *Amador v. Andrews,* 655 F.3d 89, 103 (2d Cir.2011) (stating that inmate was able to file appeal to CORC following his receipt of a superintendent's response that he was forwarding of the grievance to IG for investigation); *Percinthe,* 2009 WL 2223070, at *2 (indicating that inmate was able to file appeal to CORC following a finding of unsubstantiation by IG, after "[t]he Inmate Grievance Program reported the incident to the Inspector General's office for investigation").

Granted, some disagreement exists whether a harassment grievant must appeal to CORC where the IG's finding of unsubstantiation *follows a referral by a superintendent.* Some cases reason that, because a superintendent's referral to the IG must be preceded by a finding that *if true* the grievance would represent bona fide case of harassment, when such a referral occurs the grievant has received at least "partial favorable relief."[FN24] However, these cases inexplicably ignore the fact that the IG has subsequently found that the grievance is *not true.* It is difficult to understand how a plaintiff can be found to have received "partial favorable relief" in a case based on his mere statement of an actionable claim, where that claim has been dismissed for lack of evidence. Not surprisingly, the Second Circuit has expressly recognized that a superintendent has neither granted nor denied a grievance where he has simply forwarded it to the Inspector General's office for investigation. *Amador v. Andrews,* 655 F.3d 89, 103 (2d Cir.2011) ("On July 11, 2003, the superintendent responded, neither granting nor denying the grievance, stating only, 'Your grievance has been forwarded to the Inspector General's office for further investigation.' ").

FN24. *See, e.g.,* *Andrews v. Cruz,* 04–CV–0566, 2010 WL 1142010, at *4–5 (S.D.N.Y. March 9, 2010); *Pagan v. Brown,* 08–CV–0724, 2009 WL 2581572, at *7–8 (N.D.N.Y. Aug. 19, 2009) (Kahn, J., adopting Report–Recommendation of DiBianco, M.J.); *Lawyer v. Gatto,* 03–CV7577, 2007 WL 549440, at *8 (S.D.N.Y. Feb. 21, 2007); *Hairston v. LaMarche,* 05–CV–6642, 2006 WL 2309592, at *9 (S.D.N.Y. Aug. 10, 2006).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

After carefully reviewing the relevant case law, the Court finds that the better-reasoned cases answer this question in the affirmative: a harassment grievant must appeal to CORC even where the IG's finding of unsubstantiation follows a referral by a superintendent. *See, e.g., Torres v. Carry,* 672 F.Supp.2d 338, 343–44 (S.D.N.Y.2009) (finding no exhaustion where [1] inmate received response from superintendent informing him that the Inspector General's Office was investigating the matter, [2] he subsequently received neither an investigative report from the Inspector General's Office nor a further response from the superintendent, and [3] he never completed the exhaustion process by receiving a response from CORC, as required by the regulations); *see also, supra,* note 17 of this Decision and Order. This conclusion is also supported by the hearing testimony adduced in this case. (Hrg. Transcript at 31–32, 75–77, 83–85.)

Here, Plaintiff never filed any such appeal, either after any referral to the IG or after the conclusion of the IG's investigation. *See, supra,* note 9 and accompanying analysis in Part III of this Decision and Order. (*See also* Hrg. Transcript at 67–71; Hrg. Ex. D–4E.) It is important to note that Plaintiff received notice of the conclusion of the IG's investigation. (Hrg. Transcript at 114.)

***11** For all of these reasons, the Court rejects (as a ground to excuse the exhaustion requirement) the fourth circumstance relied on by Plaintiff.

**3. Fifth Circumstance Asserted by Plaintiff**

With regard to the fifth circumstance asserted by Plaintiff (i.e., the purported fact that an appeal to CORC would have been futile under the circumstances because CORC would merely have "rubber stamped" the IG's conclusion that Plaintiff's claims were unsubstantiated), the Court finds that it would *not* have been futile to file an appeal with CORC under the circumstances. The Court bases this finding on the following: (1) the hearing testimony of Inmate Grievance Program Director Karen Bellamy; (2) the version of DOCs Directive 4040 in effect during the time in question; and (3) cases requiring an appeal to CORC following an conclusion of unsubstantiation by the IG. (Hrg. Transcript at 58–88; Hrg. Ex. D–2E .) *See also, supra,* Part III.C.2. of this Decision and Order.

Granted, at the hearing, Inmate Grievance Program Director Bellamy testified that, if a complaint is found by the IG to be unsubstantiated, then "we kind of ... go with that" on appeal. (Hrg. Transcript at 77.) However, taken in its totality her hearing testimony explains as follows: (1) the coordinators in her office at CORC only "*probably* go down to the IG's office" and get information that they "go with"; (2) whether they "go with" the results of the IG's investigation "*depends* "; and (3) even if they "go with" the results of the IG's investigation, a separate investigation may still be conducted. (Hrg. Transcript at 77, 87 [emphasis added].) This is not surprising given that it strains credulity to believe that, if an IG report were perceived to be deficient by CORC, the inmate's appeal would perfunctorily be denied. Indeed, the added layer of review by CORC is the very reason cases hold that, following an conclusion of unsubstantiation by the IG, an appeal to CORC is required in order to exhaust. *See, supra,* Part III.C.2. of this Decision and Order (citing cases). In short, the authority of CORC to depart from the result of an IG investigation is the very thing that requires Plaintiff to appeal to CORC to complete the exhaustion process.

It is important to note that district courts have rather uniformly rejected arguments, and even testimony, that he need not have filed an appeal to CORC because doing so would have been futile. *See, e.g., White v. Ercole,* 06–CV–11361, 2009 WL 602890, at *2, 4 (S.D.N.Y. March 3, 2009) (rejecting as unpersuasive inmate's affirmation swearing that an appeal to CORC would have been futile); *Rodriguez v. Goord,* 05–CV–6131, 2008 WL 495514, at *4, 6 (W.D.N.Y Feb. 21, 2008) (rejecting inmate's argument that an appeal to CORC would have been futile); *Muniz v. Goord,* 04–CV–0479, 2007 WL 2027912, at *3, 5 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (rejecting inmate's argument that an appeal to CORC would have been futile); *Hill v. Chalanor,* 419 F.Supp.2d 255, 259 (N.D.N.Y. March 8, 2006) (Kahn, J.) ("If Plaintiff chooses to pursue said appeal to the CORC, he should be sure to contact whatever prison officials he must, and comply with all appeal procedures. Plaintiff must exhaust all available administrative remedies, even

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Slip Copy, 2012 WL 4449937 (N.D.N.Y.)

(Cite as: 2012 WL 4449937 (N.D.N.Y.))

is such exhaustion would result in futility or ineffectiveness."); *Morrow v. Goord,* 03–CV–0713, 2005 WL 1159424, at *3 (W.D.N.Y. May 17, 2005) ("Morrow argues that it would be futile to exhaust his administrative remedy because CORC has already reviewed a similar grievance and that its decision is not likely to change. Futility, however, is not an exception to the PLRA's exhaustion requirement."); *Wagnoon v. Johnson,* 02–CV–10282, 2004 WL 583764, at *3 (S.D.N.Y. March 23, 2004) ("Plaintiff's apparent belief that the required appeal to CORC would ultimately be fruitless is insufficient to excuse nonexhaustion. Exhaustion of administrative remedies is required even if an inmate believes that such exhaustion would be futile.").[FN25] As United States District Judge Thomas J. McAvoy of this District explained in *Muniz v. Goord,*

> FN25. *Cf.* *Davidson v. Talbot,* 01–CV–0473, 2005 WL 928620, at *8 (N.D.N.Y. Mar. 31, 2005) (Treece, M.J.) ("Exhaustion is similarly required even if the prisoner asserts futility as an excuse."), *adopted by* 2006 WL 1877144 (N.D.N.Y. Jul 5, 2006) (Scullin, J.); *Williams v. Comstock,* 03–CV–0782, 2004 WL 2646544, *2 (W.D.N.Y. Nov. 18, 2004) ("In the Second Circuit, formal compliance with the IGP is required and an inmate must exhaust his administrative remedies even if such exhaustion would be futile or ineffective."); *Arce v. Keane,* 01–CV–2648, 2004 WL 439428, at *5 (S.D.N.Y. March 9, 2004) ("[F]utility will not excuse an inmate's failure to exhaust his administrative remedies."); *Petit v. Bender,* 99–CV–0969, 2003 WL 22743485, at *5 (S.D.N.Y. Nov. 19, 2003) ("In the Second Circuit, formal compliance with the Inmate Grievance Program is required and an inmate must exhaust his administrative remedies even if such exhaustion would be futile or ineffective.").

> ***12** [In making his futility argument] Plaintiff confuses a prisoner's ability to appeal to CORC with a prisoner's chances of success during such an appeal. Simply because a prisoner might not stand a realistic chance of success during an appeal does not mean that the administrative appellate process is not 'available' to the prisoner. (If so, then any prisoner with an unmeritorious or frivolous claim would not have the administrative appellate process 'available' to him.)

*Muniz,* 2007 WL 2027912, at *5.

It is also important to note that, despite Plaintiff's argument, absolutely no hearing testimony or exhibits were adduced establishing that futility was why he did not appeal to CORC. (*See* Hrg. Transcript, at 2–121; Hrg. Exs.)

For all of these reasons, the Court rejects (as a ground to excuse the exhaustion requirement) the fifth circumstance relied on by Plaintiff.

**4. Sixth Circumstance Asserted by Plaintiff**

With regard to the sixth circumstance asserted on by Plaintiff (i .e., the purported fact that the IG investigation served the same purpose as the grievance process), based on the hearing testimony exhibits, the Court finds that (1) as an initial matter, the purpose of the IG investigation was materially different from the purpose of the grievance process (2) even if the two purposes were the same, that fact does not excuse a failure to exhaust. The Court bases this finding on the following: (1) the hearing testimony of Inmate Grievance Program Director Karen Bellamy; (2) the hearing testimony of IG Senior Investigator Anthony Misercola; (3) the letter of complaint written by Plaintiff to OMH Unit Chief Maureen Bosco; (4) the investigative file of IG Senior Investigator Anthony Misercola; (5) the version of DOCs Directive 4040 in effect during the time in question; (6) cases requiring an appeal to CORC following an conclusion of unsubstantiation by the IG; and (7) cases finding that futility does not relieve an inmate of the duty to appeal to CORC. (Hrg. Transcript at 58–105; Hrg. Exs. D–2E, D–6E, D–10E.) *See also, supra,* Parts III.C.2. and III.C.3. of this Decision and Order.

Based on the record evidence, it appears that, with regard to harassment grievances, the focus of an IG investigation is on ascertaining the wrongdoing of a correctional employee for purposes of *discipline,* while the focus of the grievance process is to provide an inmate a method for *resolving* allegations of employee misconduct meant to annoy, intimidate or harm an inmate. (Hrg. Transcript at 25, 29–30, 103; Hrg. Exs. D–2E, D–10E.) Simply stated, the purpose of the former is to determine

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

whether to discipline an employee, while the purpose of the latter is to determine whether to give relief to an inmate. (*Id.*) Indeed, when asked to compare the two things, Grievance Sergeant Scott McLean testified credibly that an "IG's investigation would have nothing to do with mine"; similarly, Senior Investigator Anthony Misercola testified credibly that "[m]y purview is sex crimes investigation. What they do in grievance is separate from me.... My investigations have nothing to do with the grievance-they're two totally separate processes.... I've never been contacted by CORC regarding an appeal. They don't have purview over my investigations." (Hrg. Transcript at 25, 102–103, 105.) This appears to be the case here, where the relief requested in Plaintiff's grievance was essentially to ensure that he would be kept apart from Defendants for the remainder of his incarceration at DOCCS, not the disciplining of Defendants. (Hrg.Ex.D–6E.)

***13** In any event, even if the IG investigation served the same purpose as the grievance process, that fact would not relieve Plaintiff of the duty to file an appeal with CORC. In addition to flying in the face of the plain language of DOCCs Directive 4040 and the hearing testimony of Scott McClean and Karen Bellamy, a contrary rule would undermine the cases holding that, following an conclusion of unsubstantiation by the IG, an appeal to CORC is required in order to exhaust. *See, supra,* Part III.C.2. of this Decision and Order (citing cases). A contrary rule would also undermine the cases holding that futility or ineffectiveness is not a ground for relieving an inmate of filing an appeal to CORC. *See, supra,* Part III.C.4. of this Decision and Order.

For all of these reasons, the Court rejects (as a ground to excuse the exhaustion requirement) the sixth circumstance relied on by Plaintiff.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is *DISMISSED* in its entirety **without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

N.D.N.Y.,2012.

Goodson v. Silver
Slip Copy, 2012 WL 4449937 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.